# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

UNITED STATES OF AMERICA,
THE STATE OF FLORIDA,
*ex rel* WILLARD REVELS,

           Plaintiffs,

v.

HCA HEALTHCARE, INC.,
PUTNAM COMMUNITY MEDICAL
CENTER OF NORTH FLORIDA, LLC,
PARALLON BUSINESS SOLUTIONS,
LLC, and LIFEPOINT HEALTH, INC.,

           Defendants.

_____/

Civil Action No. 3:19-cv - 834-J-32JRK

**FILED IN CAMERA AND
UNDER SEAL PURSUANT TO
31 U.S.C. 3730(B)(2), FEDERAL
FALSE CLAIMS ACT**

**JURY TRIAL DEMANDED**

**[DO NOT PLACE ON PACER]**

## QUI TAM COMPLAINT AND JURY DEMAND

Willard Revels (the "Relator") brings this action on behalf of the United States of America and the State of Florida against Defendants, HCA Healthcare, Inc., Putnam Community Medical Center of North Florida, LLC, Parallon Business Solutions, LLC, and LifePoint Health, Inc., pursuant to the qui tam provisions of the Federal False Claims Act, 31 U.S.C. 3729 et seq., and the qui tam provisions of the Florida False Claims Act, Fla. Stat. 68.081 et seq. Relator also brings an independent claim against Defendants, HCA Healthcare, Inc. and Putnam Community Medical Center of North Florida, LLC, in his personal capacity for unlawful retaliation under the Federal False Claims Act.

1

## I.     INTRODUCTION

1.     This is an action seeking to recover damages and civil penalties brought by Relator on behalf of the United States of America and the State of Florida flowing from the sustained and uninterrupted fraudulent course of conduct of the Defendants in:

      a.    causing the submission of false or fraudulent claims to the United States of America and the State of Florida;

      b.    making, using, or causing to be made or used, false records or statements material to false or fraudulent claims to the United States of America and the State of Florida; and

      c.    knowingly concealing or knowingly and improperly avoiding or decreasing obligations to pay or transmit money or property to the United States of America and the State of Florida.

Such fraudulent course of conduct occurred over at least a 10-year period as shall be set forth specifically herein, and upon information and belief, continues to date relative to the diagnostic respiratory testing services taking place at Putnam Community Medical Center ("PCMC") in Palatka, Florida.    Relator also brings an independent claim against Defendants, HCA Healthcare, Inc. and Putnam Community Medical Center of North Florida, LLC, in his personal capacity for unlawful retaliation under the Federal False Claims Act.

2.     This action is predicated upon Defendants' actions and omissions in **knowingly submitting ineligible billings to, and failing to self-report and timely reimburse -- or reimburse at all -- millions of dollars unlawfully collected from the following government-funded programs**:

      a.    The federally funded Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. 1395 et seq.;

      b.    The federally and state-funded Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. 1396 et seq.;

c.    Tricare - a federally funded program of the US Department of Defense, the provides medical benefits to the spouses and unmarried children of service members and reservists ordered to active duty for 30 days or longer, the unmarried spouses and children of deceased service members, and retired service members. 10 U.S.C. s.1071 et seq.; 32 C.F.R. 199.1, et seq;

d.    ChampVA - is a federally funded program that furnishes medical benefits to spouses and children of deceased or permanently disabled veterans;

e.    Veteran's Choice – is a federally funded program that offers medical benefits to eligible veterans choosing to receive care at a community provider rather than a VA facility; and

f.    Federal Railroad Retirement - is a federally funded program that offers medical benefits to eligible retired railroad employees and their family members.

(collectively, the "Federal Health Care Programs")

3.    The Federal Health Care Programs have paid millions of dollars in taxpayer funds over a ten-year period for:

a.    medically unnecessary and unreasonable diagnostic sleep lab tests administered to patients;

b.    medically unnecessary and unreasonable diagnostic respiratory tests administered to patients;

c.    medically unnecessary and unreasonable physician services rendered as the direct consequence of the above-referenced diagnostic sleep lab and respiratory tests; and

d.    medically unnecessary and unreasonable durable medical equipment supplied to patients as the direct consequence of the above-referenced diagnostic sleep lab and respiratory tests

at and/or in affiliation with PCMC.

4.    The claims and billings at issue in this action are false or fraudulent because:

a.    Defendants submitted claims and billings by incorporating references to specific codes without ever having satisfied the physician supervision standard required by those codes to justify payment; and

3

b.  Defendants submitted claims and billings by incorporating references to specific codes without ever having satisfied the supervising physician record-keeping requirement established by those codes to justify payment.

In short, Defendants unlawfully billed the Federal Health Care Programs for professional services that were not supported by the necessary physician work or documentation.

5.  As shall be detailed herein, Defendants submitted claims for these codes in contravention of the Federal Health Care Programs' coding requirements, and knowingly sought payment for services ineligible for such payment.

## II.  **PUTNAM COMMUNITY MEDICAL CENTER ("PCMC")**

6.  PCMC is a 99-bed acute care facility owned and operated by HCA Healthcare, Inc. ("HCA"), the largest hospital network in the United States.

7.  At all times material to this Complaint, virtually all the patients receiving health care services at PCMC were eligible to receive benefits under the Federal Health Care Programs.

8.  At all times material to this Complaint, PCMC was operated as a certified medical provider under Medicare and Medicaid, and thereby eligible to bill each of the Federal Health Care Programs for the diagnostic testing services at issue in this action.

9.  At all times material to this complaint, PCMC conducted polysomnographic diagnostic sleep tests ("PSG tests") on patients suffering from sleep disorders such as obstructive sleep apnea, a potentially fatal condition where the patient stops breathing for extended periods of time while asleep.[1]

---

[1]  The Mayo Clinic advises that obstructive sleep apnea can lead to a multitude of serious health problems, including stroke, high blood pressure, heart disease and sudden death:

Sudden drops in blood oxygen levels that occur during obstructive sleep apnea increase blood pressure and strain the cardiovascular system. Many people with obstructive sleep apnea develop high blood

10.    A PSG test is used to diagnose obstructive sleep apnea, as well as other sleep disorders, and involves overnight patient stays at PCMC's sleep lab facility (the "Sleep Lab"). For the PSG tests, the patient is hooked up with approximately 30 leads which are used to monitor, among other things, the patient's heart rate, breathing and body movement during sleep.

11.    Results of the PSG tests are then scored by appropriately credentialed sleep technicians and then the raw data and Technical Reports are interpreted by the sleep medicine physician. The Technical Reports and Sleep Medicine Physician's Interpretation Report would be reviewed by the patient's treating physician.  If the patient achieves a certain score, the physician prescribes a follow-up CPAP ("continuous positive airway pressure") titration study ("CPAP study" or "CPAP test") and the durable medical equipment (a CPAP or BiPAP machine) deemed "medically reasonable and necessary" to treat the sleep disorder.[2]  CPAP and BiPAP ("bilevel positive airway pressure") machines are medical devices used to keep a patient's airway open during sleep to promote unobstructed breathing.[3]

---

pressure (hypertension), which can increase the risk of heart disease. The more severe the obstructive sleep apnea, the greater the risk of coronary artery disease, heart attack, heart failure and stroke. Obstructive sleep apnea increases the risk of abnormal heart rhythms (arrhythmias). These abnormal rhythms can lower blood pressure. If there's underlying heart disease, these repeated multiple episodes of arrhythmias could lead to sudden death.

https://www.mayoclinic.org/diseases-conditions/obstructive-sleep-apnea/symptoms-causes/syc-20352090

The Division of Sleep Medicine at Harvard Medical School echoes these same concerns and observed that former NFL Hall of Fame defensive end Reggie White "died of cardiac and pulmonary problems [at age 43] that were likely intensified by his sleep apnea."

http://healthysleep.med.harvard.edu/sleep-apnea/living-with-osa/health-consequences#

[2] Medicare coverage is limited to those items and services deemed reasonable and necessary for the diagnosis or treatment of an illness or injury (and within the scope of a Medicare benefit category).

[3] All references to CPAP machines hereinafter shall be deemed to include BiPAP machines.  The Centers for Medicare & Medicaid Services ("CMS") broadly defines a CPAP device as follows: "a machine that introduces air into the breathing passages at pressures high enough to overcome obstructions in the airway in order to improve airflow." 42 C.F.R. 424.57(a).  That definition is broad enough to accurately describe BiPAP devices.

12.    Since at least 2009 and continuing through and until at least March 1, 2019 (the "Fraudulent Billing Period"), Defendants, LifePoint Health, Inc. ("LifePoint"), HCA, Putnam Community Medical Center of North Florida, LLC, and Parallon Business Solutions, LLC ("Parallon"), collectively submitted false or fraudulent bills to the Federal Health Care Programs for diagnostic PSG tests and respiratory tests[4] that failed *per se* to meet threshold eligibility standards.

13.    Throughout the Fraudulent Billing Period, it was well known by each of the Defendants that providers could bill Medicare only for those sleep tests and respiratory tests performed that were both "reasonable and necessary," and  that a diagnostic PSG sleep and/or respiratory test qualified as "reasonable and necessary" under 42 C.F.R. 410.32 **if – and only if – performed by nonphysician personnel who were under general physician supervision and control**.[5]

14.    Although the physical presence of a properly credentialed physician was not required *while* each diagnostic test was being administered, "general supervision" expressly mandated that a properly credentialed physician be responsible for the "overall direction and control" of the sleep and respiratory testing taking place at PCMC throughout the Fraudulent Billing Period. And, at a minimum, such "overall direction and control" required that the physician: (1) furnish ongoing training of all nonphysician personnel actually performing the PSG sleep and respiratory tests, and (2) provide ongoing maintenance reviews of the necessary

---

[4] Throughout the Fraudulent Billing Period, the respiratory tests consisted of electrocardiograms (EKGs), electroencephalograms (EEGs), pulmonary functions tests (PFTs) and pulse oximetry tests.

[5] Indeed, 42 C.F.R. 410.32(b)(1) unambiguously declares that "[s]ervices furnished without the required level of supervision are **not reasonable and necessary**" (emphasis added).

equipment and supplies utilized by the nonphysician personnel in performing those tests. 42 C.F.R. 410.32(b)(3)(i).

15.     At no time during the Fraudulent Billing Period did a properly credentialed physician – or, indeed, *any physician at all* – provide ongoing training of the non-physician personnel performing the various diagnostic sleep and respiratory tests at issue in this action.

16.     Furthermore, at no time during the Fraudulent Billing Period did a properly credentialed physician – or *any physician at all* – provide ongoing maintenance reviews of the necessary equipment and supplies utilized by the nonphysician personnel in performing those diagnostic sleep and respiratory tests.

17.     42 C.F.R. 410.32(d)(2)-(4) further requires that accurate records reflecting compliance with the "reasonable and necessary" standards governing the diagnostic sleep and respiratory tests at issue in this action be maintained.

18.     At no time during the Fraudulent Billing Period were accurate records reflecting compliance with such "reasonable and necessary" standards maintained.

19.     As the direct and clearly foreseeable consequence of such noncompliance with these regulatory requirements, Defendants, LifePoint, HCA and Putnam Community Medical Center of North Florida, LLC  knowingly caused physicians with privileges at PCMC to falsely or fraudulently bill the Federal Health Care Programs for services rendered in reviewing the noncompliant sleep and respiratory tests. Additionally, those same physicians frequently also prescribed CPAP machines for their patients to utilize while sleeping at home, which caused further false or fraudulent billings of the Federal Health Care Programs for the CPAP machines and associated supplies furnished by third-party vendors.

7

20.     The actual damages inflicted upon the United States of America and the State of Florida by Defendants as the proximate consequence of their fraudulent billing of the Federal Health Care Programs exceed several million dollars, as will be explained more fully hereinafter.

### III.    JURISDICTION AND VENUE

21.     This Court has jurisdiction over the subject matter of this action pursuant to 31 U.S.C. 3732(a), 28 U.S.C. 1331, and 28 U.S.C. 1345.

22.     This Court also has original jurisdiction of the Florida False Claims Act counts pursuant to 31 U.S.C. 3732(b), as those counts are brought under Florida law to recover funds paid by the State of Florida and arise from the same transactions or occurrences providing the basis for the Federal False Claim Act counts brought under 31 U.S.C. 3730.

23.     This Court also has supplemental jurisdiction of the Florida False Claims Act counts pursuant to 28 U.S.C. 1367.

24.     This Court has personal jurisdiction over the Defendants pursuant to 28 U.S.C. 3732(a) as each is found in and transacts substantial business in the Middle District of Florida.

25.     Venue is proper in this District pursuant to 31 U.S.C. 3732(a) as each of the Defendants can either be found in, resides in or transacts business in in the Middle District of Florida, the violations of law under the Federal False Claim Act and the Florida False Claims Act occurred within this District.

26.     The claims asserted in this Complaint by Relator are not based upon allegations or transactions that are the subject of a civil suit or an administrative civil money penalty proceeding in which the United States of America is a party. See 31 U.S.C. 3730(e)(3).

27.     Relator shall make voluntary disclosures to the United States of America contemporaneous with the service of this Complaint and shall serve a Disclosure Statement upon the United States of America as required by 31 U.S.C. 3739(b)(2).   A copy of this Complaint and a similar Disclosure Statement shall be served upon the State of Florida.

## IV.     PARTIES

### A.     Plaintiffs

28.     The United States of America is a Plaintiff to this action on behalf of the Department of Health and Human Services ("HHS"), the Centers for Medicare & Medicaid Services ("CMS"), and the Federal Health Care Programs.

29.     Medicare is a government health insurance program for those 65 years or older, and for those with certain disabilities. 42 U.S.C. 426, 426A.  Medicare is administered by CMS, which is part of HHS. CMS contracts with private entities who serve as its agents in analyzing and paying claims submitted by healthcare providers. Each such contracted private entity is referred to as a Medicare Administrative Contractor (or "MAC"). See 42 U.S.C. s.1395h; 42 C.F.R 421.3, 421.100.

30.     Throughout the Fraudulent Billing Period, the MAC to whom the Defendants submitted the false or fraudulent billings at issue in this action was Wisconsin Physician Services ("WPS").

31.     Medicare payment is contingent upon a determination that a service meets a benefit category, is not specifically excluded from coverage, and the item or service is "reasonable and necessary." 42 U.S.C. 1395y states that, subject to certain limited exceptions, no payment may be made for any expenses incurred for items or services that are not

"reasonable and necessary" for the diagnosis and treatment of illness or injury or to improve the functioning of a malformed body member.

32.     The Medicare statute itself does not set forth a comprehensive list of specific items or services eligible for coverage as "reasonable and necessary." The approach adopted by Congress was to identify categories of items and services, but vest authority in the HHS Secretary to determine the specific items and services within such categories to be covered. In other words, the statute generally authorizes Medicare to cover medical devices, surgical procedures and diagnostic services, but does not identify each specific covered (or excluded) item or service.   Those specific determinations are made by CMS in the form of national coverage determinations ("NCDs") or, in the absence of an NCD, by the MACs in the form of local coverage determinations ("LCDs").  See CMS-3062-N.

33.     NCDs are generated via an evidence-based process, with opportunities for public notice and input. In the absence of an NCD on point, an item or service may be covered at the discretion of the MACs in accordance with a relevant LCD promulgated by them. See CMS-3062-N.  Akin to the procedure leading to the creation of NCDs, MACs issue LCDs via an evidence-based process, with opportunities for public notice and input.

34.     In order to participate in the Medicare program as a provider of medical or other health services, or as a supplier of durable medical equipment, providers[6] are required to

---

[6] CMS defines the term "provider" generally as:

Any Medicare provider (e.g., hospital, skilled nursing facility, home health agency, outpatient physical therapy, comprehensive outpatient rehabilitation facility, end-stage renal disease facility, hospice, physician, non-physician provider, laboratory, supplier, etc.) providing medical services covered under Medicare Part B. Any organization, institution, or individual that provides health care services to Medicare beneficiaries. Physicians, ambulatory surgical centers, and outpatient clinics are some of the providers of services covered under Medicare Part B.

https://www.cms.gov/apps/glossary/default.asp?Letter=P&Language=English

execute and submit an enrollment application to CMS. The application requires that each provider affirmatively certify that it will honor all applicable Medicare laws, regulations and program instructions, and clearly discloses that payment of a claim by Medicare is conditioned upon the claim's compliance with all such laws, regulations and program instructions.

35.     For outpatient treatment, all Medicare reimbursement is subject to Part B. See 42 U.S.C. 1395j-1395w-4. All the diagnostic sleep and respiratory tests at issue in this action are included in the definition of "medical and other health services" for purposes of Medicare Part B coverage. See 42 C.F.R. 410.10(e).

36.     The Medicaid program, 42 U.S.C. 1396 et seq., is a government health insurance program funded jointly by the federal and state governments. Each state administers its own Medicaid program, but remains subject to, and governed by, all applicable federal statutes, regulations and guidelines.

37.     Medicaid provides secondary insurance coverage for many recipients of Medicare, and often pays, in whole or in part, the premium for Medicare Part B.

38.     In order to participate in the Medicaid program as a provider of medical or other health services, the provider must execute and submit an agreement affirmatively certifying that the provider will comply with all local, state and federal laws, as well as rules, regulations and statements of policy issued relative to the Medicaid program.

39.     Throughout the Fraudulent Billing Period, Defendants submitted false or fraudulent claims to Medicare, Medicaid and other Federal Health Care Programs for diagnostic testing services and medical equipment that they knew, or should have known, were ineligible for payment in violation of the Medicare and Medicaid provider certifications they had made.

40.     Specifically, throughout the Fraudulent Billing Period, Defendants submitted thousands of billing claims to Medicare, Medicaid and other Federal Health Care Programs utilizing a form promulgated by CMS known as Form 1500.  These Form 1500s contained different numbered fields that the provider must complete, including the patient's name, address, insurance identification number, referring physician's name, and patient's diagnosis. These Form 1500s also required the service provider to identify all Current Procedural Technology ("CPT") codes for each discrete medical service provided, the dates and locations of the medical services that were rendered, the specific charges claimed for each such service, and the provider's NPI number.  Throughout the Fraudulent Billing Period, these Forms 1500s were then submitted by the provider, either directly or through its chosen billing agent, electronically to the MAC for review, processing and payment authorization.

41.     Throughout the Fraudulent Billing Period, each Form 1500 that was submitted, or caused to be submitted, by Defendants to Medicare, Medicaid and other Federal Health Care Programs affirmatively represented as follows:

> In submitting this claim for payment from federal funds, I certify that: 1) the information on this form is true, accurate and complete; 2) I have familiarized myself with all applicable laws, regulations, and program instructions, which are available  from the Medicare contractor; 3) I have provided or will provide sufficient information required to allow the government to make an informed eligibility and payment decision; 4) this claim, whether submitted by me or on my behalf by my designated billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment...; 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision....

42.     Each Form 1500 also clearly conveyed to the Defendants before submission of each claim that:

> No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 CFR 424.32).

12

> NOTICE: Anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

43.     Throughout the Fraudulent Billing Period, each of the Defendants was intimately familiar with these mandatory, fundamental notices and certifications. Indeed, in many of their public filings with the SEC, both HCA and LifePoint have emphasized the serious liabilities attendant the submission of ineligible claims to the Federal Health Care Programs.

44.     The Medicare Provider Agreements executed by the Defendants reinforced this bedrock necessity for accurate, compliant billing and required Defendants to conform with all applicable federal laws, rules and regulations, including all Medicare laws, regulations, reporting requirements, and CMS instructions. Those Provider Agreements further made unmistakably clear that:

   a.     services rendered by nonphysician providers were eligible for reimbursement only if those nonphysician providers were supervised by an appropriately credentialed physician; and

   b.     payments to Defendants for provider services were being made, in whole or in part, from federal funds, and subjected Defendants to all laws applicable to individuals or entities receiving federal funds, including the False Claims Act.[7]

---

[7] Those Provider Agreements also required the Defendant providers to maintain a compliance plan that included measures to detect, correct and prevent fraud; written policies, procedures and standards of conduct detailing the provider's commitment to comply with all applicable federal standards; the designation of a compliance officer and compliance committee responsible for high level oversight of provider's compliance plan; effective training and education for providers' compliance officer and employees, governing body members, and agents; enforcement of standards through well-publicized disciplinary action; procedures for effective, routine internal monitoring and auditing; and procedures for ensuring prompt responses to detected offenses and development of corrective action initiatives related to any evidence of fraud and misconduct. Additionally, *the Provider Agreements required that, within 5 business days of becoming aware of an actual, suspected or potential compliance or fraud concern, Defendant providers were to report such compliance or fraud concern to WPS.* As shall be shown in further detail herein, that reporting never happened.

The executed Provider Agreements are in the possession, custody and/or control of Defendants, HCA, LifePoint, Putnam Community Medical Center of North Florida, LLC, and Parallon, and will have to be produced during or

45.     Throughout the Fraudulent Billing Period, Defendants submitted false or fraudulent claims to Medicare, Medicaid and other Federal Health Care Programs for diagnostic PSG and respiratory testing services that they knew, or clearly should have known, were *per se* ineligible for payment, and in direct violation of the Medicare and Medicaid provider certifications they had made in each Form 1500 they submitted during that timeframe.[8]

46.     The State of Florida is a Plaintiff in this action.  Throughout the Fraudulent Billing Period, Defendants submitted false or fraudulent claims to Florida Medicaid for services and equipment that were ineligible for payment.

47.     Relator, Willard Revels, was employed as a polysomnography technologist at PCMC from December 2013 through May 2015, at which time he was promoted by PCMC to Manager of the Sleep Lab. Relator served as the Manager of the Sleep Lab through March 1, 2019, the date his employment was terminated as the result of an alleged reshuffling of HCA "business priorities" that abruptly ended all Sleep Lab services performed at PCMC.  Relator is currently employed as a registered polysomnography technologist ("RPSGT") in Oklahoma.

---

discovery. However, those Provider Agreements should currently be in the possession, custody and/or control of the United States of America and the State of Florida.

[8] It bears underscoring that Defendants HCA, LifePoint and Parallon were – and continue to be – highly experienced, well-financed, sophisticated and successful businesses active in, and intimately familiar with, the field of Medicare and Medicaid billing and payment regulation.  Moreover, at all times material to this Complaint, CMS offered – and continues to offer – comprehensive outreach and education resources to hospitals and their agents via its Medicare Learning Network ("MLN") should any needs for clarification arise: https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNGenInfo/Index.html

Significantly, each of the Provider Agreements also affirmatively obligated the Defendant providers to complete the fraud, waste and abuse, and general compliance training modules available at the MLN, and to maintain their respective compliance training records for a period of 10 years.

48.     The factual allegations in this Complaint that form the predicate for the False Claim Act liability of each of the Defendants are based upon information Relator personally discovered as the consequence of:

a.     his pre-employment consultations with LifePoint in May-June 2013;

b.     his subsequent employment at PCMC from December 2013 through March 1, 2019;

c.     his many conversations and email exchanges with his superiors at PCMC from December 2013 through March 1, 2019;

d.     his many conversations and email exchanges with PCMC patients (and prospective patients) from December 2013 through March 1, 2019;

e.     his many conversations and email exchanges with PCMC's billing department staff from December 2013 through March 1, 2019;

f.     his conversations and email exchanges with representatives of CMS, WPS, and sleep medicine authorities and accreditation entities; and

g.     his personal efforts, observations, research and investigation.

49.     From December 2013 through March 1, 2019, Relator was personally familiar with the false or fraudulent billing policies, practices and actions of the Defendants as alleged herein. He would regularly interact with the PCMC billing department employees in explaining/clarifying appropriate service codes to be used in submitting claims for payment to Medicare, Medicaid and other Federal Health Care Programs; investigating patient concerns when Medicare, Medicaid and other Federal Health Care Programs refused to pay for certain sleep lab services billed; and communicated frquently with Utilization Review personnel from insurers such as Blue Cross, United Healthcare, Humana (and others) regarding authorization approvals for sleep testing for patients with Medicare and Medicaid plans which were administered by those private companies.  These interactions occurred on almost a daily basis and the majority were prompted by inquiries received by Relator from PCMC billing

department agents whose primary job function was to complete the Form 1500s for the billing of Medicare, Medicaid and other Federal Health Care Programs.

50.     Relator was also personally aware of Defendants' actual submissions of false or fraudulent billings to Medicare, Medicaid and other Federal Health Care Programs because he periodically was informed by his superiors of the sums paid by Medicare, Medicaid and Federal Health Care Programs to PCMC for the diagnostic testing the Sleep Lab had performed.[9]

51.     Relator also regularly was directed by his superiors at PCMC to increase the number of patients tested -- *and Medicare, Medicaid and other Federal Health Care Program billings generated* -- by the Sleep Lab facilities he managed.

52.     From December 2013 through March 1, 2019, virtually all the patients Relator and PCMC technicians administered PSG and respiratory tests to – *in excess of 90%* – were insured under Medicare, Medicaid and other Federal Health Care Programs.[10]   Indeed, an important part of the Sleep Lab's responsibilities was confirming each patient's insurance coverage in advance of testing; if patients were referred by their physicians to PCMC for Sleep Lab diagnostic testing, one of the threshold responsibilities Relator (and his staff) had was to

---

[9] Additionally, PCMC was required by HCA to compile annual reports documenting the financial performance of each discrete department and sub-department within the hospital, and David Hartzell, Relator's Director of Cardiopulmonary Services, shared with him a portion of one such report showing that the Sleep Lab had increased year-over-year profits by 25% in 2016 vs. 2015, and had increased year-over-year revenues by 40% during that same timeframe.  As over 90% of the patients served by Relator and other staff members of the Sleep Lab were beneficiaries of Medicare, Medicaid and other Federal Health Care Programs, the lion's share of PCMC revenues derived from the performance of sleep lab diagnostic services was paid by Medicare, Medicaid, and other Federal Health Care Programs.

[10] Given the demographics of the greater Palatka, Florida area during July 2009-December 2013, it is reasonable to presume that this 90%+ figure likewise governed that timeframe as well, and it is anticipated that discovery in this action will bear this out.

make contact with the patient to confirm his or her specific insurance coverage and co-pay obligation in advance of performing any services.[11]

53.     Relator is the original source of the facts set forth in this Complaint that give rise to the legal claims asserted herein. Such legal claims are not reliant upon publicly disclosed information.

## B.     Defendants

54.     Defendant, HCA Healthcare, Inc. ("HCA"), is a publicly traded company (ticker symbol: HCA) headquartered in Nashville, Tennessee. It is the largest private, for-profit healthcare services organization in the United States. As per its most recent Form 10-K filed with the U.S. Securities and Exchange Commission, as of December 31, 2018, HCA owned and operated 175 general, acute care hospital facilities, including PCMC.[12]   As of June 10 2019, HCA's website declares that HCA "owns and operates 185 hospitals and approximately 1,800 sites of care, including surgery centers, freestanding emergency rooms, urgent care centers, and physician clinics in 21 states and the United Kingdom."[13]

55.     HCA, together with several of its affiliated entities, has an amply documented history of submitting false or fraudulent claims to the Government, which history has resulted in the imposition of billions of dollars in fines, sanctions and civil damages to date.

---

[11]  Occasionally, patients for whom PSG testing had been scheduled contacted Relator and his staff members to cancel their appointments because they had decided they simply couldn't afford to pay the copayments required of them under Medicare, Medicaid, and other Federal Health Care Programs.

[12]  https://www.sec.gov/Archives/edgar/data/860730/000119312519047078/d676301d10k.htm at p. 3. Prior to May 8, 2017, HCA was incorporated and known as HCA Holdings, Inc.

[13]  https://investor.hcahealthcare.com/corporate_profile

56.     As part of the settlement of one False Claims Act criminal prosecution, HCA

agreed in December 2000 to plead guilty to criminal conduct and pay over $840,000,000.00 in

criminal fines, civil penalties and damages for alleged unlawful billing practices.[14]

57.     In 2002, another False Claim Act prosecution resulted in HCA's payment of

over $2,000,000,000.00 in settlement, and other False Claim Act prosecutions resulted in

multimillion-dollar settlements in 2012, 2013, 2015 and 2017.[15]

58.     Defendant, Putnam Community Medical Center of North Florida, LLC, was

formed as a Florida limited liability company in January 2015 and holds license number 4350

to operate PCMC as a "statutory rural hospital."  The sole managers of the LLC disclosed in

the filings on record with the State of Florida are all insiders, officers and/or directors of HCA

located in Nashville, Tennessee.  Upon information and belief, ownership and control of

Putnam Community Medical Center of North Florida, LLC -- and specifically, PCMC

operations -- ultimately reside with HCA.  Indeed, *inter alia*, HCA:

    a.     accounts for the revenues and profits generated at its affiliate hospitals,
           including PCMC, as part of its publicly reported revenues and profits;

    b.     recruits, trains, places, reviews and promotes executives at its affiliate
           hospitals, including PCMC;

    c.     publicizes and promotes its affiliate hospitals, including PCMC, as HCA; and

    d.     requires each of the HCA affiliate hospitals, including, PCMC, to honor and
           abide by comprehensive, detailed policies and procedures promulgated by
           HCA.

---

[14]  https://www.justice.gov/archive/opa/pr/2000/December/696civcrm.htm

[15]  See, e.g., https://www.justice.gov/opa/pr/hospital-chain-hca-inc-pays-165-million-settle-false-claims-act-allegations-regarding

https://slphealthcareupdate.com/tag/overbillng/

https://www.lexology.com/library/detail.aspx?g=7c4399a6-9f3e-44c5-801a-314e80a321dc

https://whistleblowerjustice.net/nations-largest-healthcare-fraud-settlement-doesnt-stop-medical-behemoth/

59.     Defendant, Parallon Business Solutions, LLC ("Parallon"), is a limited liability company organized, formed, and transacting business in Tennessee.  The sole managers of the LLC disclosed in the filings on record with the State of Florida are all insiders, officers and/or directors of HCA located in Nashville, Tennessee. Upon information and belief, ownership and control of Parallon operations ultimately reside with HCA.

60.     Parallon is registered to do business in the State of Florida as a foreign limited liability company and has been since its creation in May 2011.  Irrespective of whether it is ultimately shown that ownership and control of Parallon operations ultimately reside with HCA, Parallon was appointed by HCA and its affiliate hospitals, including PCMC, as their agent in preparing bills, submitting claims for payment and collecting payment for the healthcare services provided at HCA hospitals across the nation, including PCMC.  At all times material to this Complaint, Parallon staff members were referred to by PCMC's Executive Administration as the hospital's "Patient Accounts Department."

61.     On or about the date of HCA's acquisition of PCMC from LifePoint, Parallon reviewed, generated, audited, processed and submitted the false or fraudulent billings to Medicare, Medicaid and other Federal Health Care Programs on behalf of PCMC.

62.     On or about the date of HCA's acquisition of PCMC from LifePoint, Parallon served and acted as the authorized agent of HCA and Putnam Community Medical Center of North Florida, LLC, in reviewing, generating, auditing, processing and submitting the false or fraudulent billings to Medicare, Medicaid and other Federal Health Care Programs on behalf of PCMC.

63.     Parallon is jointly and severally liable with HCA and Putnam Community Medical Center of North Florida, LLC for creating, causing to be created, submitting and/or

19

causing to be submitted the false or fraudulent billings to Medicare, Medicaid and other Federal Health Care Programs on behalf of PCMC that are the subject of this action.                    64.

Parallon also is jointly and severally liable with HCA and Putnam Community Medical Center of North Florida, LLC for failing to report and/or return to the Government the falsely or fraudulently billed payments made under Medicare, Medicaid and other Federal Health Care Programs.

65.     Defendant, LifePoint Health, Inc. ("LifePoint"), is a Delaware corporation headquartered in Brentwood, Tennessee. It is currently privately owned but had been a publicly traded company (ticker symbol: LPNT) through November 2018. As per its last Form 10-K filed with the U.S. Securities and Exchange Commission in February 2018, as of December 31, 2017, LifePoint owned and operated 71 hospital facilities in 22 states, and generated over $6,200,000,000.00 in annual revenue in each of its 2017 and 2016 fiscal years, and over $5,200,000,000.00 in annual revenue in 2015.[16]

66.     LifePoint owned and operated PCMC as Putnam Community Medical Center, LLC until PCMC was sold to HCA in 2015 for $18,800,000.[17]

67.     The Medicare provider number utilized by PCMC for claims submission and billing purposes while owned and operated by LifePoint remained the same and continued to be utilized for claims submission and billing purposes after PCMC was acquired by HCA.

68.     Medicare patients continued to be treated at PCMC, without interruption, subsequent to the ownership transfer from LifePoint to HCA.

---

[16]   https://www.sec.gov/Archives/edgar/data/1301611/000130161118000005/lpnt-20171231x10k.htm at p. 1. Prior to April 12, 2015, when it changed its name, LifePoint was known as LifePoint Hospitals, Inc. References to LifePoint hereafter shall be deemed to include LifePoint Hospitals, Inc. as well.

[17]   https://www.sec.gov/Archives/edgar/data/1301611/000095014406000856/g99126e10vk.htm at p. F-23.

69.     Under the facts alleged in paragraphs 67 and 68, and in accordance with governing law, HCA and Putnam Community Medical Center of North Florida, LLC are jointly and severally liable with LifePoint for the false or fraudulent billings to Medicare, Medicaid and other Federal Health Care Programs on behalf of PCMC – and LifePoint's failure to report and return the revenues received as a direct consequence of those false or fraudulent billings – that took place prior to PCMC's 2015 change in ownership.

## V.     THE FALSE AND FRAUDULENT BILLING OF MEDICARE, MEDICAID AND OTHER FEDERAL HEALTH CARE PROGRAMS

### A.     The Importance of Diagnostic Sleep Testing

70.     The American Academy of Sleep Medicine (the "AASM")[18] identifies categories of sleep disorders that collectively afflict millions of Americans. Some of the most common such disorder categories are insomnia, narcolepsy/excessive daytime sleepiness, restless legs syndrome, REM behavioral disorders, and obstructive sleep apnea.

71.     Obstructive sleep apnea occurs when a patient's airways collapse during sleep, thereby causing an obstruction and preventing the patient from being able to push adequate air past that obstruction.

72.     Certain illnesses (or "comorbidities") are caused or exacerbated by obstructive sleep apnea. The most common comorbidities are high blood pressure (which can trigger a stroke), heart disease and Type II diabetes.

---

[18] Throughout the Fraudulent Billing Period, AASM has partnered with HHS and the Department of Justice in preventing and combatting fraud in the sleep medicine provider space. See, e.g., https://aasm.org/hhs-and-doj-form-new-fraud-team/

73.     The most common diagnostic tool utilized for the diagnosis of sleep disorders is polysomnographic diagnostic sleep testing (the "PSG test").    The PSG test is a comprehensive recording of the biophysiological changes that occur during sleep.

74.     Typically, patients are referred to a sleep lab for PSG testing because the patient's physician suspects that the patient suffers from obstructive sleep apnea or one of the other disorders that disrupt sleep. The initial PSG test requires an overnight stay at the sleep lab. Prior to administering the test, a sleep lab technician connects approximately 30 leads to the patient in order to evaluate a variety of bodily functions such as heart rhythm, breathing and body movement.

75.     The result produced by the PSG test is referred to as a polysomnogram.  The polysomnogram is scored based on criteria utilizing the Apnea Hypopnea Index (AHI) or the Respiratory Distress Index (RDI). Under either the AHI or the RDI, the polysomnogram records the average number of respiratory events – i.e., apneas (the complete cessation of breathing for 10 or more seconds) and hypopneas (partial obstructions of breathing for 10 or more seconds) – experienced by the patient per hour of sleep.[19]

76.     Once the polysomnogram is scored by the Sleep Technologist, the Technical Report and Raw Data are then reviewed and interpreted by the Sleep Medicine Physician who renders the diagnosis and dictates his report. The hospital Health Information Management department then transcribes the dictated report, the patient's referring physician then reviews it and decides whether a CPAP titration study and CPAP equipment are reasonable and

---

[19] An AHI or RDI score of 5 to 15 events per hour is classified as "mild obstructive sleep apnea," an AHI or RDI score of 15 to 30 events per hour is classified as "moderate obstructive sleep apnea," and an AHI or RDI score exceeding 30 events per hour is classified as "severe obstructive sleep apnea." If a patient suffers from significant comorbidities such as high blood pressure or heart disease, then a lower AHI or RDI score can classify the patient as suffering from "moderate obstructive sleep apnea" or "severe obstructive sleep apnea."

necessary. CPAP equipment is intended to keep a patient's airway open during sleep, thus enabling unobstructed breathing.

77.     If prescribed by the physician, the patient subsequently returns to the sleep lab for the CPAP titration study.  This study is similar to the PSG test -- except that it involves the patient wearing a CPAP device (a mask connected to a machine).  During the CPAP titration study, the sleep lab technologist determines the correct amount of pressure required to eliminate the patient's sleep obstruction, together with the appropriate fit and type of mask to be utilized by the patient. Once these determinations are made, the patient may use the CPAP device at home.

**B.     Fraudulent Billing Concerns and Medicare Eligibility Requirements for Payment of Polysomnography and Respiratory Diagnostic Test Services**

78.     The United States of America, HHS Office of Inspector General, has identified fraudulent sleep lab billing practices as a special area of recent investigative interest.

79.     In 2013 the OIG published its report entitled *Questionable Billing for Polysomnography Services,*[20] that determined – in 2011 alone – Medicare had paid almost $17,000,000.00 for polysomnography services that did not comply with at least one of the "reasonable and necessary" Medicare requirements.

80.     In 2015, the OIG published its report entitled "*First Coast Service Options, Inc. Paid Some Unallowable Sleep Study Claims,*"[21] which – although limited in its audit scope – extrapolated that Medicare may have paid almost $16,000,000.00 for polysomnography

---

[20] https://oig.hhs.gov/oei/reports/oei-05-12-00340.asp

[21] https://oig.hhs.gov/oas/reports/region4/41307039.pdf

services that did not comply with at least one of the "reasonable and necessary" Medicare requirements over a 21 month period.

81.     In 2016, the OIG published its report entitled *"Sleep Health Center Billed Medicare for Some Unallowable Sleep Study Services,"*[22] which – although again limited in its audit scope – uncovered significant payments made by Medicare programs for polysomnography services that failed to comply with at least one of the "reasonable and necessary" Medicare requirements.

82.     In 2016, the OIG also announced commencement of a multi-year investigation of sleep lab billing practices and publicly conveyed, in clear and unmistakable terms, that "Medicare will *not pay for items or services that are not "reasonable and necessary"*[23] (emphasis added).

83.     On June 12, 2019, OIG publicly released its report based on that multi-year investigation, in which it concluded that:

> "On the basis of our sample [audit] results, we estimated that Medicare made *overpayments of $269 million for polysomnography services* during the [2 year] audit period."

(emphasis added)[24]

84.     Additionally, in 2013, the Department of Justice announced that American Sleep Medicine, LLC of Jacksonville, Florida had agreed to pay $15,301,341.00 to resolve

---

[22] https://oig.hhs.gov/oas/reports/region4/41407053.pdf

[23] https://oig.hhs.gov/reports-and-publications/workplan/summary/wp-summary-0000123.asp

[24] https://oig.hhs.gov/oas/reports/region4/41707069.asp

allegations that it had billed Medicare and other federally funded programs for sleep diagnostic services that were ineligible for payment.[25]

85.     The DOJ press release announcing the settlement of the charges brought against American Sleep Medicine, LLC unequivocally declared:

> "Medicare patients and military families deserve to be treated by appropriately credentialed professionals when seeking medical care," said Stuart F. Delery, Principal Deputy Assistant Attorney General for the Justice Department's Civil Division. *"When companies providing those services seek to skirt the rules, there will be a steep price to pay."*

(emphasis added).

86.     Medicare, Medicaid, and other Federal Healthcare Programs only reimburse for medically "reasonable and necessary" polysomnography and respiratory testing services. 42 U.S.C. 1395y(a)(1)(A); Fla. Stat. 409.905; TRICARE Policy Manual, 6010.54-M Ch. 11, s.12.1 (II)(C)(7).

87.     For polysomnography and respiratory testing services to be eligible for payment under Medicare, Medicaid, and other Federal Healthcare Programs as medically "reasonable and necessary" services, it is mandated that they be performed under an appropriate level of physician supervision.   42 C.F.R. 410.32(b)(1)[26]; see also Fla. Stat. 409.905 ("Any service under this section shall be provided only when medically necessary and in accordance with state and federal law."); Fla. Stat. 409.905(4), (6); Fla. Stat. 409.907.

88.     Although the physical presence of a properly credentialed physician is not necessary *while* these tests are being administered, the "general supervision" standard set forth

---

[25] https://www.justice.gov/opa/pr/florida-based-american-sleep-medicine-pay-153-million-improperly-billing-medicare-and-other

[26] 42 C.F.R. at s.410.32(b)(1) plainly states that "[s]ervices furnished without the required level of supervision are **not** reasonable and necessary." (emphasis added)

in 42 C.F.R. 410.32 expressly required a properly credentialed physician to be responsible for the "overall direction and control" of the sleep and respiratory testing taking place at PCMC at all times during the Fraudulent Billing Period. At a minimum, such "overall direction and control" required that the physician: (1) furnish ongoing training of all nonphysician personnel personally performing the sleep and respiratory tests, and (2) provide ongoing maintenance reviews of the necessary equipment and supplies utilized by the nonphysician personnel in performing those tests. 42 C.F.R. 410.32(b)(3)(i).

89.     The governing 42 C.F.R. 410.32 standards were well publicized by CMS, and well known to the Defendants.

90.     Indeed, such regulatory standards were first issued back on October 31, 1997; further, CMS issued a formal *Program Memorandum* on April 19, 2001 to underscore to providers the need for physician supervision of diagnostic testing.[27]

91.     Yet, despite the clarity of these regulatory standards, and the fact that providers had been given ample advance notice thereof, at no time during the Fraudulent Billing Period did a properly credentialed physician – or, indeed, *any physician at all* – provide ongoing training of the non-physician personnel performing the diagnostic sleep and respiratory testing taking place at PCMC.

92.     Furthermore, at no time during the Fraudulent Billing Period did a properly credentialed physician – or *any physician at all* – provide ongoing maintenance reviews of the

---

[27] See HHS Program Memorandum B-01-28 (April 19, 2001).

necessary equipment and supplies utilized by the nonphysician personnel in performing those diagnostic sleep and respiratory tests.[28]

93.     At no time during the Fraudulent Billing Period did a properly credentialed physician – or, indeed, *any physician at all* – ever observe, monitor, or provide any direction to the nonphysician personnel in performing those diagnostic sleep and respiratory tests.

94.     At no time during the Fraudulent Billing Period did a properly credentialed physician – or, indeed, *any physician at all* – ever provide the nonphysician personnel administering such diagnostic tests a contact phone number so that the latter could reach out to a physician in the event that events arose during a testing procedure that warranted a physician's involvement.

95.     At no time during the Fraudulent Billing Period did a properly credentialed physician – or, indeed, *any physician at all* – ever author policies and procedures to govern the conduct of nonphysician personnel in administering diagnostic sleep and respiratory tests.

96.     Performing diagnostic EKGs for both outpatients and inpatients was the responsibility of respiratory therapists in the Cardiopulmonary Services department at PCMC. At all times material to this Complaint, those respiratory therapists were obligated to perform diagnostic EKGs in conformance with the orders given by the attending physicians at PCMC.

97.     However, "serial EKGs," which were (and are) ordered to aid in the diagnosis of myocardial infarctions – *i.e.*, heart attacks – frequently were not performed in accordance

---

[28] The fact that there was never any physician supervising the various diagnostic sleep and respiratory tests conducted at PCMC was well known to hospital administration. Indeed, PCMC's CEO, Chris Mosley, actually boasted to subordinates that he had saved PCMC money by not engaging a physician to provide such services.

with the orders given by the attending physicians because the night shift at PCMC was often inadequately staffed.

98.     The frequent inadequate staffing of respiratory therapists at PCMC was directly traceable to the fact that the Chief Financial Officers (initially Stewart Whitmore and subsequently Matthew Johnson) dictated staffing levels instead of – *and regularly in contravention of the medical judgments made by* – the Director of Cardiopulmonary Services.

99.     At all times material to this complaint, PCMC's Chief Financial Officers controlled staffing levels at the hospital by superimposing a system of "units of service" – which system assigned a numeric value to each diagnostic test and procedure performed by the respiratory therapists – upon all such staffing decisions.   In other words, PCMC's Chief Financial Officers substituted an arcane financial calculus for independent medical judgments as to the best interests of the patient population.

100.    PCMC's Chief Financial Officers were able to get away with these improper practices as the direct and proximate consequence of the hospital's noncompliance with 42 CFR 410.32.

101.    Specifically, had an appropriately credentialed physician been put in place to supervise "overall direction and control" of the Cardiopulmonary Services department at PCMC, that supervising physician would have ensured that staffing judgments were made in accordance with the best medical interests of the patient population – and not the pecuniary interests of the hospital.

102.    Furthermore, the absence of an appropriate credentialed physician to supervise "overall direction and control" of the Cardiopulmonary Services department caused a further violation of 42 CFR 410.32's mandate.   Specifically, at all times material to this Complaint,

42 CFR 410.32 provided, and continues to provide, that "maintenance of the necessary equipment and supplies are [to be] the continuing responsibility of the [supervising] physician." Obviously, nothing of the sort ever occurred at PCMC since there was never an appropriately credentialed supervising physician in place.

103.    Accordingly, and by default, all "maintenance of the necessary equipment and supplies" for performing diagnostic EKGs, EEGs, PFTs and PSGs became and remained the continuing responsibility of *nonphysician* personnel. Exacerbating this deficiency is the fact that *no physician had ever even written policies and procedures for the nonphysician personnel to follow*. In short, the nonphysician personnel were left to fend for themselves in this regard.

104.    The failure of the Executive Administration at PCMC to provide a supervising physician for the Cardiopulmonary Services department allowed the CFO to exercise overall control of the diagnostic tests performed by virtue of his control of the purse and staffing levels.

105.    At no time material to this Complaint was either CFO (Whitmore or Johnson) was a licensed physician.

106.    At no time material to this Complaint was either CFO (Whitmore or Johnson) was a licensed respiratory therapist.

107.    At no time material to this Complaint did either CFO (Whitmore or Johnson) possess any medical credentials or qualifications relevant to rendering what amounted to clinical judgments in determining the number of nonphysician personnel required to perform diagnostic tests or render medical care to patients at PCMC.

108.    Incident to an onsite investigation at PCMC that occurred in late 2015/early 2016 and was triggered by the tragic death of a child patient, the Florida Agency for Healthcare

Administration concluded that PCMC's staffing levels were inadequate. Those findings were conveyed to PCMC's Executive Administration and to HCA.

109.    However, neither the repeated failures to perform "serial EKGs" (used to aid in the diagnosis of heart attacks) as ordered by licensed physicians, nor even the death of a child, served to convince the Executive Administration of PCMC that the Chief Financial Officer lacked the medical or clinical qualifications to exercise "overall direction and control" of the Cardiopulmonary Services department via staffing decisions.

110.    Notwithstanding repeated prior warnings from the Director of Cardiopulmonary Services (Kimberly Moore, an experienced licensed respiratory therapist) – or even the written findings of the Florida Agency for Healthcare Administration – that staffing levels of nonphysician personnel at PCMC were inadequate, the CFOs (Whitmore and then Johnson) continued to exercise "overall direction and control" of the Cardiopulmonary Services department's staffing levels.

111.    In short, not a single one of the diagnostic PSG and respiratory tests performed by nonphysician personnel at PCMC during the Fraudulent Billing Period complied with the physician supervision requirements of 42 C.F.R. s.410.32, and therefore none of them were eligible for payment under Medicare, Medicaid or any other Federal Healthcare Programs. See 42 C.F.R. 410.32(b)(1) (by definition, diagnostic testing services "furnished without the required level of supervision **are not reasonable and necessary**") (emphasis added).

112.    At all times material to this Complaint, the handling of nonphysician staffing decisions by PCMC's CFO was a decision made and approved by the hospital's Executive Administration.

113.    Furthermore, at all times material to this Complaint, HCA was on notice of, and either condoned or affirmatively authorized, the foregoing violations of 42 C.F.R. s.410.32.

114.    Patient health and welfare were being jeopardized throughout the Fraudulent Billing Period, but the laser-like focus of PCMC's Executive Administration and HCA remain the hospital's bottom line.

C.    **Defendants' Failure to Comply with Regulatory Requirements for Diagnostic Testing Services Renders Physician Review of Testing and DME Ordered for Patients Based on Such Testing Ineligible for Payment**

115.    Medicare Part B generally pays for the review and interpretation by the patient's physician of diagnostic test results and, if appropriate, the rental or purchase of durable medical equipment prescribed by that patient's physician – provided that the physician service and durable medical equipment are deemed "necessary and reasonable for treatment of an illness or injury." CPAP and BiPAP machines are types of durable medical equipment.

116.    As stated hereinabove, none of the diagnostic sleep and respiratory tests performed by nonphysician personnel at PCMC during the Fraudulent Billing Period ever complied with the physician supervision requirements of 42 C.F.R. 410.32, and therefore none of them were ever eligible for payment under Medicare, Medicaid or any other Federal Healthcare Programs as "necessary and reasonable" services.

117.    As the efforts of the patient physicians in reviewing and interpreting those diagnostic test results, and in prescribing CPAP devices based on those interpretations, were premised entirely upon tests that failed to meet the "reasonable and necessary" standard, the physician and durable medical equipment billings submitted by such providers likewise failed

to meet the "reasonable and necessary" standard under Medicare, Medicaid or any other Federal Healthcare Programs.[29]

118.    Accordingly, Defendants' various compliance failures, and submission misrepresentations and material omissions, "caused" the physician and DME providers to submit false claims to Medicare, Medicaid and other Federal Healthcare Programs for payment.

**D.    Defendants' Failure to Comply with Regulatory Requirements for Diagnostic Testing Services "Caused" Multiple Insurance Company Intermediaries to Present Billings to the United States of America and the State of Florida That Were Wholly Ineligible for Payment**

119.    Throughout the Fraudulent Billing Period, Defendants' compliance failures, and submission misrepresentations and material omissions, "caused" Blue Cross, United Healthcare, Humana, Aetna and other insurance companies (the "Insurance Company Intermediaries") to unknowingly present false or fraudulent billings to the United States of America and the State of Florida.

120.    Throughout the Fraudulent Billing Period, the Insurance Company Intermediaries collected payments from the United States of America and the State of Florida that were then remitted to PCMC for having performed diagnostic sleep tests and other respiratory tests in violation of 42 C.F.R. 410.32.

121.    The presentation of those false or fraudulent billings to the United States of America and the State of Florida comprised a significant percentage of the diagnostic sleep

---

[29] The NCD issued by CMS for CPAP therapy for Obstructive Sleep Apnea on March 13, 2008 clearly requires that any provision of CPAP devices be justified by a Medicare-sanctioned PSG test. See Publication Number 100-3; Manual Section Number 240.4.

and respiratory tests performed for patients with Medicare and Medicaid plans administered by the Insurance Company Intermediaries.

## E.     False Claims Act Legal Standards

122.     The False Claims Act provides for the award of treble damages and significant civil penalties against those who, *inter alia*, knowingly cause the submission of false or fraudulent claims for payment to the United States Government. 31 U.S.C. 3729(a)(1).

123.     In pertinent part, the False Claims Act declares that any "person" that

> knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
>
> knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim...;
>
> *** [or]
>
> knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,
>
> is liable to the United States Government for a civil penalty of not less than [$11,463] and not more than [$22,927][30] ..., plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. 3729(a)(1)(A),(B),(G).

124.     In illuminating the broad reach of the False Claims Act, Congress established the following definitions in 31 U.S.C. s. 3729(b) that are germane to this action:

(1)     the terms "knowing" and "knowingly"-

---

[30] These individual civil penalty ranges are to be adjusted for inflation per the Federal Civil Penalties Inflation Adjustment Act of 1990.  31 U.S.C. 3729(a)(1)(G).

(A)    mean that a person, with respect to information-

        (i)    has actual knowledge of the information;

        (ii)    acts in deliberate ignorance of the truth or falsity of the information; or

        (iii)    acts in reckless disregard of the truth or falsity of the information; and

(B)    require no proof of specific intent to defraud;

(2)    the term "claim"-

    (A)    means any request or demand, whether under a contract or otherwise, for money or property, and whether or not the United States has title to the money or property, that-

        (i)    is presented to an officer, employee or agent of the United States; or

        (ii)    is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government-

            (I)    provides or has provided any portion of the money or property requested or demanded; or

            (II)    will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded....

(3)    the term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and

(4)    the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

F.

G.      **Relevant Factual History**

125.    In May 2013, Relator was contacted by Kimberly Moore, the then-Director of Cardiopulmonary Services at PCMC, and solicited to consider employment at PCMC's Sleep Lab. Moore and Relator had worked together at Highlands Regional Medical Center in Sebring, Florida ("HRMC").  From August 2010 through her departure in February/March 2013, Moore served as the Director of Cardiopulmonary Services at HRMC, was Relator's direct supervisor, and had been positively impressed by Relator's work performance and professionalism.  Accordingly, when Moore perceived the need for improvements to be made to PCMC's Sleep Lab operations shortly after she began employment at PCMC, she thought of Relator as a logical candidate.

126.    On or about May 28, 2013, Relator made the trip from Sebring to Palatka, Florida, to evaluate PCMC's Sleep Lab, and speak further with Moore concerning potential employment at PCMC.

127.    After reviewing the equipment and inquiring into the protocols at PCMC's Sleep Lab, Relator advised Moore that he could not consider employment at PCMC. Specifically, Relator informed Moore and PCMC's then-Chief Nursing Officer, Kari Bolin, that the equipment utilized by PCMC's Sleep Lab failed to satisfy federal requirements, and he would not consider employment at PCMC under those conditions.  Relator was informed by Moore that the PCMC Sleep Lab had utilized the deficient equipment in question – *and billing Medicare and Medicaid for PSG and CPAP tests performed in connection therewith –* since 2009!

128.    In the presence of then-CNO Bolin, Moore then asked Relator what specific actions he recommended be taken in light of the facts he had learned.

129.   Relator was very clear in his response; he stated to Moore and Bolin that the Sleep Lab should be closed immediately and that Defendant, LifePoint, should self-report to CMS the improper Medicare and Medicaid billings it had submitted over the approximate 4 year period during which noncompliant equipment had been relied upon to perform diagnostic PSG testing on Sleep Lab patients.

130.   PCMC's Sleep Lab was closed very shortly after Relator's visit.[31]

131.   Moore and/or Bolin shared Relator's findings and recommendations with PCMC's Risk Manager, Catherine Webb.

132.   Shortly thereafter Webb briefed Susan Cherry, LifePoint's Director of Risk Management, concerning the matter and solicited guidance from Cherry regarding the appropriate handling of the CMS self-report issue.

133.   Upon information and belief, the obligation to self-report the improper Medicare and Medicaid billings to CMS was also raised with LifePoint's legal and compliance departments, but LifePoint ultimately determined that disclosing the improper billing of Medicare and Medicaid for PSG testing done at PCMC from 2009 through late May-early June 2013 need not – or should not – occur.

134.   Upon information and belief, none of the Defendants has ever made disclosure to CMS of the improper billing of Medicare and Medicaid for PSG testing done at PCMC from 2009 through late May-early June 2013.

135.   PCMC did acquire federally compliant equipment for the Sleep Lab and Moore thereafter approached Relator anew about prospective employment at PCMC.   Relator

---

[31] Discovery will evidence the precise date of the closure, but Relator knows that it occurred during the very brief period of time between May 29 and June 4, 2013.

ultimately did accept an offer of employment as a technologist at PCMC's Sleep Lab and began working there in December 2013.

136.   Between December 2013 and May 2015, Relator worked as a technologist in the Sleep Lab and reported directly to Kimberly Moore, Director of Cardiopulmonary Services. During that time frame, Relator was an hourly employee with no supervisory or management responsibilities.

137.   During September 2014, newspapers in Palatka reported that The Sleep Medicine Center – an Independent Diagnostic Testing Facility (IDTF) which had a clinic location in Palatka – had settled False Claim Act charges advanced by the Department of Justice. This news was of particular interest to several PCMC employees since the owner of The Sleep Medicine Center – Hubert Zachary – was a former PCMC employee.  Zachary -- who referred to himself to other PCMC employees as "Dr. Zachary" despite not having a license to practice medicine[32] – previously had managed PCMC's Sleep Lab.

138.   In a subsequent conversation he had with Kim Moore, Relator mentioned that he had reviewed the Department of Justice website after learning of the news report, and discovered that one of the charges the Department of Justice had leveled at The Sleep Medicine Center involved its failure to provide the required physician supervision of the diagnostic sleep tests performed there.  Relator further observed to Moore that – as far as he was aware – no physician supervision of the Sleep Lab was taking place at PCMC either.  Relator also mentioned that he had not received any physician training since he had been hired as a technologist at PCMC.

---

[32] Zachary was licensed as a Registered Respiratory Therapist and a Mental Health Counselor.

139.     Moore was under the impression that Dr. Iftikhar Ahmad, whom she understood had the *title* of Medical Director of Cardiopulmonary Services at PCMC, had been providing whatever physician supervision of the Sleep Lab federal law required.[33]

140.     Surprised to hear from Relator that Dr. Ahmad might not have been providing the physician supervision of the Sleep Lab required by law, Moore approached PCMC's then-CEO, Jerry Christine, to bring the matter to his attention.  For her effort, Moore was tersely told by Christine that contractual matters between the hospital and its physicians were *his* responsibility, and the conversation quickly concluded.

141.     In early March 2015, it was announced that HCA, through its HCA North Florida Division, had entered into a contract with LifePoint to acquire PCMC.[34]

142.     Upon information and belief, HCA formally acquired PCMC on May 1, 2015.[35]

143.     In May 2015, Relator was promoted to the position of Manager of the PCMC Sleep Lab.  In that role, he reported directly to Moore, who continued to serve as PCMC's Director of Cardiopulmonary Services.

144.     In his new role as Manager, Relator sought to do everything in his power during the summer of 2015 to ensure that the Sleep Lab was being operated in full accordance with all federal and state regulatory requirements.

---

[33] Moore further mentioned that she had seen a copy of Dr. Ahmad's contract to serve as Medical Director of Cardiopulmonary Services in 2013.

[34] https://www.staugustine.com/article/20150305/business/303059939

[35] https://www.bizjournals.com/jacksonville/news/2015/05/12/putnam-county-medical-center-reopens-under-hca.html

145.    Relator first requested and received a copy of the "hospital privileges" of the two "sleep physicians" at PCMC, Dr. Iftikhar Ahmad and Dr. Kaushalendra Singh, to document the fact that PCMC had granted privileges in sleep medicine to them.

146.    Relator thereafter scheduled an appointment with Dr. Ahmad at the latter's office to discuss sleep lab operations and document compliance with governing regulatory requirements.[36]

147.    During their meeting, Relator explained that he had recently been promoted to Manager of the Sleep Lab. Relator mentioned that he had been made aware of the fact that Dr. Ahmad had been designated the Medical Director of Cardiopulmonary Services at PCMC, and that Relator wished to have Dr. Ahmad approve written policies and procedures for the Sleep Lab, and to have regular biweekly meetings with Dr. Ahmad to ensure that the Sleep Lab was functioning in full accordance with Dr. Ahmad's approved policies and procedures as Medical Director. Relator also had brought to the meeting a document for Dr. Ahmad to sign that would enable him to receive compensation for the time spent that day in meeting with Relator.

148.    Dr. Ahmad advised Relator that notwithstanding his signature on the 2012 contract, Ahmad had never performed any of the duties of a Medical Director of Cardiopulmonary Services or received any compensation for doing so.

149.    During this meeting with Relator, Dr. Ahmad indicated that if PCMC Executive Administration wished for him to serve as the Medical Director of Cardiopulmonary Services, the terms set forth in the 2012 contract would have to be renegotiated. Specifically, Dr. Ahmad

---

[36] Moore had shown Relator a copy of the contract that Dr. Ahmad apparently had signed with PCMC in 2012 providing for his appointment as Medical Director of Cardiopulmonary Services. That contract also provided Dr. Ahmad was to be paid $120.00 per hour for shouldering the responsibilities of Medical Director. One of the principal reasons Relator had sought the meeting with Dr. Ahmad was to ensure that the PCMC Sleep Lab would have the required physician supervision in place to satisfy 42 CFR 410.32.

stated to Relator that he was aware PCMC recently had been acquired by HCA and knew Medical Directors at the HCA-owned hospital in Gainesville were receiving $24,000.00 per year to perform Medical Director responsibilities. He advised that he would be willing to serve as Medical Director of Cardiopulmonary Services at PCMC, but only if compensated at the same $24,000.00 per year rate.

150.    After returning to PCMC, Relator briefed Moore on the meeting and reported that Dr. Ahmad was unwilling to serve as Medical Director of Cardiopulmonary Services unless paid $24,000.00 per year for the additional responsibilities that role entailed.

151.    Thereafter, Moore approached Dr. Singh to determine whether he would be willing to serve as Medical Director of Cardiopulmonary Services at the $120.00 per hour rate reflected in the 2012 "contract" between PCMC and Dr. Ahmad. Dr. Singh agreed to accept those terms.

152.    Moore thereafter sought a meeting with PCMC's then-newly appointed CEO, Chris Mosley, to brief him on the matter. At a meeting held in Mosley's office on July 30, 2015, Moore informed PCMC's CEO, *inter alia*, that under federal law she believed that PCMC might be exposed to liability by not having a physician supervising the diagnostic sleep lab and/or respiratory testing occurring at the hospital. She also shared that, throughout the time she had been serving as Director of Cardiopulmonary Services, Dr. Ahmad – although signatory to a 2012 contract to serve as Medical Director – had never performed any of the duties of Medical Director, and claimed he had never been paid by PCMC for such duties. Moore provided Mosley with a copy of Dr. Ahmad's 2012 "contract" as well as a copy of 42 C.F.R. 410.32 for his review. To Moore's surprise, Mosley pushed the copies of Dr. Ahmad's

"contract" and 42 C.F.R. 410.32 back across his desk towards her and tersely observed: "I don't see any problem with the situation."[37]

153.   Given's Mosley's response, Moore determined that she needed to escalate the matter to PCMC's designated Compliance Officer. That next day, Moore emailed Stewart Whitmore, PCMC's Compliance Officer,[38] to brief him on the matter on July 31, 2015. She designated the importance of the communication as "High." Moore's email to Whitmore is reproduced below, in pertinent part:

> **Stewart,**
>
> **With the recent acquisition of PCMC by HCA, and our upcoming QRS survey, there is a matter I believe requires clarification by you in your capacity as our Compliance Officer. It regards the status of our "Medical Director" ("Supervising Physician") for Cardiopulmonary Services here at PCMC. This is the issue I discussed with Chris Mosley July 30, 2015.**
>
> **I am concerned that Dr. Iftikhar Ahmad may not be meeting the minimum standard of "physician supervision" as medical director for Cardiopulmonary Services, as set forth in Code of Federal Regulations 42 CFR 410.32:**
>
> > **"Levels of Supervision… diagnostic tests… must be furnished under at least a general level of physician supervision…."; "Under general supervision, the training of the non-physician personnel who actually perform a diagnostic procedure and the maintenance of the necessary equipment and supplies are the continuing responsibility of the physician."**

---

[37] Despite all that Moore had shared with him, Mosley never followed up with either Dr. Ahmad or Dr. Singh to determine for himself whether PCMC was performing the diagnostic PSG and respiratory testing in compliance with the 42 C.F.R. 410.32 requirements. And contrary to HCA and PCMC policy, Mosley also never presented the regulatory noncompliance issue to PCMC's Ethics and Compliance Committee.

[38] Whitmore also served as PCMC's Chief Financial Officer.

**I am also concerned that Dr. Ahmad may not be meeting the minimum standard of "physician supervision", as set forth in Centers for Medicare & Medicaid Services LCD L29949:**

> **"Pursuant to 42 CFR 410.32(b) diagnostic tests payable under the physician fee schedule that are furnished without the required level of supervision by a physician are not reasonable and necessary."**

Moore concludes her email to Compliance Officer Whitmore by asking whether PCMC is compliant with the "physician supervision" requirements set forth in the aforementioned federal regulations.

154.    On August 3, 2015, Whitmore responded to Moore's email, copying CEO Mosley.   In his response, Whitmore completely ignores the issue presented under 42 CFR 410.32.  A true and correct copy of the full email exchange between Moore and Compliance Officer Whitmore is attached hereto and incorporated herein as **EXHIBIT "A"**.

155.    Instead of acting with fidelity to his critical role as PCMC's sole Compliance Officer, Whitmore failed to undertake even rudimentary due diligence into the noncompliance issue presented, and breached HCA and PCMC policy by failing to present the matter to PCMC's Ethics and Compliance Committee.

156.    In November 2015, Moore requested that Relator assist her in completing a report she was required to submit to PCMC's Executive Administration relative to CMS' Local Coverage Determination for Polysomnography and Sleep Testing (the "PSG LCD").  This report was required of PCMC by HCA and was intended to be shared with and reviewed by compliance personnel at HCA corporate headquarters.

157.    Per the HCA report template provided, PCMC was to note, *inter alia*, any action necessary to ensure that the hospital was acting in compliance with the PSG LCD.  Relator

completed that section of the report and stated that the hospital needed to document its compliance with the "physician supervision requirements" set forth in 42 C.F.R. 410.32.

158.    However, and notwithstanding that HCA compliance personnel and PCMC's CEO and Compliance Officer were all notified of PCMC's failure to comply with the "physician supervision requirements" set forth in 42 C.F.R. 410.32, no corrective action was undertaken by either HCA or PCMC.

159.    Moore informed Relator that she continued to address the regulatory noncompliance issue with compliance officials at PCMC, but those officials proved unresponsive.

160.    Shortly after HCA's acquisition of PCMC in 2015, Chief Financial Officer Stewart Whitmore began to assert control over the staffing levels of the nonphysician personnel assigned to work all day and night shifts vis a vis a system of "units of service" – despite the CFO lacking any license as a physician or respiratory therapist, any meaningful medical education or any clinical qualifications whatsoever to evaluate the clinical staffing needs of the Cardiopulmonary Services department at PCMC.   Despite the CFO's lack of clinical qualifications, he sent nearly daily emails to Kimberly Moore insisting that she assign the nonphysician personnel in the Cardiopulmonary Department to staffing levels based on the CFO's calculation of "units of service."[39]

161.    Kimberly Moore, as a licensed respiratory therapist and Director of the Cardiopulmonary Services Department at PCMC, repeatedly complained to both Stewart

---

[39] Upon information and belief, the practice of having an HCA hospital's staffing decisions determined by the hospital's *chief financial officer* either originated with, or was accepted and condoned by, HCA. Upon information and belief, the methodology of utilizing "units of service" to address hospital staffing needs also originated with, or was accepted and condoned by, HCA. In any event, HCA certainly was om notice of such practices, and either explicitly or implicitly promoted them.

Whitmore (Chief Financial Officer), and to Kari Bolin (Chief Nursing Officer) that the staffing levels of the nonphysician personnel being imposed by the Chief Financial Officer were not adequate for the clinical needs of the patients and posed a risk of harm to the patients. Within only months thereafter, and despite having had a long and successful professional career in cardiopulmonary services up to that point, Moore's employment with PCMC was abruptly terminated. Upon information and belief, the reason offered to justify that termination – *i.e.,* breach of alleged confidentiality requirements – was a pretext. Moore had been terminated from her position as Director of Cardiopulmonary Services to silence her, and also to send a message to Relator (and perhaps other PCMC employees) that championing the need to correct the hospital's noncompliance with federal regulations could have very deleterious consequences for one's professional career.

140. In November 2016, the Director of Radiology services at PCMC, Debra Casey, requested that Relator assist her in completing an updated report to be submitted to PCMC's Executive Administration and HCA relative to the Polysomnography Local Coverage Determination. Relator met with Casey, provided her with the updated report, and advised her that none of the Polysomnography Local Coverage Determination requirements had changed in the 12 months that had elapsed since the preparation of the prior year's report in November 2015. Relator also advised Casey that the hospital Executive Administration had failed to correct the noncompliance with 42 C.F.R. 410.32 noted by him in the prior annual report. In addition to supplying the updated report to Casey, Relator also emailed a copy to PCMC's Chief Nursing Officer.[40]

---

[40] True and correct copies of the report and Relator's email to PMC's Chief Nursing Officer, Kari Bolin, are attached hereto and incorporated herein as **COMPOSITE EXHIBIT "B"**.

141.    In December 2016, Relator met with Moore's successor, the then-newly hired Director of Cardiopulmonary Services, David Hartzell, to brief him regarding PCMC's continuing violation of 42 C.F.R. 410.32 requirements. Relator informed Hartzell that the hospital's Executive Administration had failed to provide for the necessary physician supervision of the diagnostic PSG and respiratory testing functions at PCMC.  Relator further explained to Hartzell that although a "contract" had been signed by Dr. Ahmad in 2012 to serve as Medical Director for the Cardiopulmonary Services Department, Dr. Ahmad had never performed any Medical Director services – or any supervisory function whatsoever via-a-vis Sleep Lab operations. Relator also mentioned that the information he was sharing could be verified by Hartzell if he were to review the records of all PCMC nonphysician personnel in the Cardiopulmonary Services department to ascertain whether Dr. Ahmad had ever, in compliance with 42 C.F.R. 410.32's mandate: (a) supervised the ongoing training of any the nonphysician personnel performing EKGs, EEGs, PFTs, echocardiograms or PSGs, and (b) evaluated the equipment utilized by the nonphysician personnel in performing such diagnostic testing services.

142.    Subsequent to this meeting with Relator, Hartzell reviewed the personnel records and confirmed the absence of any indication that Dr. Ahmad had supervised training of those performing EKGs, EEGs, PFTs, echocardiograms or PSGs at PCMC. Hartzell further verified the absence of any evidence Dr. Ahmad had ever evaluated or approved the equipment utilized by the nonphysician personnel at the hospital in performing such diagnostic testing services.

143.    Shortly thereafter, Hartzell met with hospital CEO Mosley to discuss the matter. Hartzell wanted to ascertain who the responsible supervising physician was for the

Cardiopulmonary Services Department. In response, Mosley showed Hartzell a copy of the 2012 "contract" with Dr. Ahmad and then laughingly boasted: "I haven't paid this guy [*i.e.*, Dr. Ahmad] a nickel!"

144.    In January 2017, while reviewing the CMS website, Relator became aware of a new LCD – L36839 –approved by the hospital's MAC, Wisconsin Physician Services, and scheduled for implementation in February 2017.  LCD L36839 set forth two new mandates directly applicable to PCMC's Sleep Lab operations: first, hospital sleep labs would have to secure a separate sleep lab specific accreditation if they didn't already have that accreditation; and second, physicians who were not board-certified in sleep medicine would only be authorized to interpret PSG test results if associated with a hospital which had a board-certified sleep medicine physician on staff.

145.    Since in January 2017 PCMC complied with neither of these two additional requirements, Relator immediately sought out and met with David Hartzell, showed him a copy of the new LCD, and informed him of these further pending regulatory noncompliance issues. Relator requested that Hartzell coordinate a meeting with PCMC's Compliance Officer, Matthew Johnson, so that these new requirements could be discussed and a plan of action to bring the hospital into compliance therewith formulated.

146.    At that meeting, Relator explained to Johnson that PCMC would need to act quickly to comply with the new LCD before its intended implementation date or be foreclosed from performing sleep studies on patients with Medicare and other federally funded healthcare insurance.  Relator further explained that neither Dr. Ahmad nor Dr. Singh would be eligible to interpret sleep studies if PCMC did not secure a board-certified sleep medicine physician on staff.

147.   Johnson listened quietly as the information was presented, stated "Thank you for bring this to my attention," and then concluded the meeting without further comment.

148.   Relator received no further communication from Johnson or anyone else at PCMC regarding the concerns raised until Debra Casey emailed Relator on March 28, 2017. Casey's email to Relator had been prompted by an email she had received from HCA regarding the new regulatory requirements set forth in L36839. Casey requested that Relator research how PCMC might achieve compliance with the new LCD.

149.   Over the following few weeks, Relator compiled for Casey detailed information on how PCMC could achieve sleep lab accreditation and supplied her with a list of physicians in the central Florida region who were board-certified in sleep medicine.

150.   Over the next 13 months, *i.e.*, through May 2018, Relator met with Hartzell periodically to ascertain the progress PCMC Executive Administration was making in becoming compliant with L36839. Hartzell advised Relator that CFO/Compliance Officer. Johnson had assured him that an application had been submitted to the Joint Commission for proper accreditation of PCMC's Sleep Lab, and that Executive Administration was negotiating a contract with a colleague of Dr. Singh's, Dr. Mitra, a board-certified sleep medicine physician, to serve as Medical Director/Supervising Physician for all diagnostic PSG and respiratory testing services at PCMC.

151.   In May 2018, however, Johnson advised Hartzell that PCMC had not been able to consummate an agreement with Dr. Mitra to serve as Medical Director/Supervising Physician, and that the Executive Administration had canceled its pending application with the Joint Commission for proper accreditation of PCMC's Sleep Lab.

152.     Notwithstanding the fact that the hospital was operating in clear breach of at least three separate federal regulations, PCMC continued to accept patients covered under Medicare, Medicaid and other Federal Health Care Programs, continued to perform diagnostic PSG and respiratory testing for them, and continued to submit false or fraudulent claims for payment to the Government for those testing services.

153.     Trying to find a viable solution to cure the hospital's deficiencies under federal regulatory requirements, Relator identified another physician who was board-certified in sleep medicine, Dennis Sorresso, M.D., and provided Hartzell with his contact information. Relator suggested Hartzell reach out to PCMC Executive Administration to request that they consider Sorresso for the role of Medical Director/Supervising Physician.     154.     Hartzell did follow up with Executive Administration in this regard, and a meeting with Dr. Sorresso was arranged during the summer of 2018.

155.     Hartzell thereafter advised Relator that an agreement had been reached between PCMC Executive Administration and Dr. Sorresso for the latter to serve as Medical Director/Supervising Physician of all diagnostic PSG and respiratory testing personnel and services. Kari Bolin, PCMC's Chief Nursing Officer, confirmed to Relator as well that such an agreement had been reached with Dr. Sorresso.[41]

156.     During the late summer of 2018, Hartzell informed Relator that Johnson had advised that no agreement had been consummated with Dr. Sorresso to serve as Medical Director/Supervising Physician, and that Dr. Sorresso had withdrawn his application for

---

[41] Relator mentioned to Bolin that should for any reason an agreement not be consummated, he believed that Dr. Bipin Bhatt would likely still be willing to sign a contract to serve as Medical Director/Supervising Physician.

privileges at the hospital. Hartzell further informed Relator that Johnson had stated to him: "I want to find a doctor who will do it for nothing."

157.    Notwithstanding the fact that the hospital continued to operate in clear breach of at least three separate federal regulations, PCMC continued to accept patients covered under Medicare, Medicaid and other Federal Health Care Programs, continued to perform diagnostic PSG and respiratory testing for them, and continued to submit false or fraudulent claims for payment to the Government for those testing services.

158.    In September 2018, Hartzell arranged another meeting with the hospital's newly appointed CEO, Mark Dooley, and CFO/Compliance Officer Johnson, to discuss next steps in achieving regulatory compliance.  In advance of this meeting, Relator provided information to both Dooley and Johnson regarding the qualifications and willingness of Dr. Bipin Bhatt to serve as PCMC's Medical Director/Supervising Physician.[42] Relator was invited to, and attended, this meeting where Relator witnessed Hartzell plead with Dooley and Johnson: "Help me get legit with this."

159.    In October 2018, Relator received a telephone call from the manager of the sleep lab at Flagler Hospital in St. Augustine, Florida.  She stated that patient R.H. had been scheduled for a CPAP titration sleep study at Flagler Hospital, R.H.'s coverage was through Medicare, and R.H.'s baseline sleep study had been performed at PCMC and interpreted by Dr. Richard Feibelman.  She also shared that in checking with the physician credentialing organizations she discovered Dr. Feibelman was not properly credentialed as a board-certified sleep medicine physician, and that unless he had been supervised at PCMC by a physician who

---

[42] Dr. Bhatt was a board-certified sleep medicine physician from Highlands Regional Medical Center, another HCA-owned hospital in central Florida (Sebring).

*was* board-certified in sleep medicine, Flagler Hospital would not be able to proceed with the CPAP titration sleep study as the baseline sleep study "would be invalid."

160.    Relator immediately reached out to Hartzell to brief him on this call and requested that Hartzell promptly notify CFO/Compliance Officer Johnson concerning same. Hartzell did so, and later told Relator that Johnson had responded that "there was nothing to worry about," and that should any calls of a like nature be received by Relator in the future they should be referred directly to him (Johnson).

161.    Relator then sought out and met with PCMC's Director of Risk Management, Carolyn Boyle, concerning the hospital's continued performance of diagnostic PSG and respiratory testing on patients covered by Medicare and other Federal Health Care Programs while in breach of the regulatory requirements established by 42 CFR 410.32 and LCD L36839. Relator further observed that, as the hospital was well aware that it was acting in violation of regulatory requirements in performing such testing on patients covered by Medicare and other Federal Health Care Programs, PCMC was causing its staff physicians interpreting those diagnostic tests to likewise be in breach of federal regulatory requirements. Director Boyle initially replied that the hospital was not responsible for the actions of its physicians; however, Relator explained that since the hospital had granted privileges to these physicians to interpret the results of these diagnostic tests – and had not canceled or withdrawn those privileges upon becoming aware of the regulatory noncompliances, and that the hospital had granted privileges in sleep medicine to Dr. Feibelman during the second half of 2017 despite its knowledge that Dr. Feibelman did not meet the physician certification requirements contained in CMS LCD L36839 – it appeared to him that the hospital could be exposing itself to potential liability in such regard.

162.    In the months following the events referred to in paragraphs 159 through 161 hereinabove, absolutely no corrective measures were implemented by PCMC Executive Administration.  And notwithstanding the fact that the hospital continued to operate in clear breach of at least three separate federal regulations, PCMC continued to accept patients covered under Medicare, Medicaid and other Federal Health Care Programs, continued to perform diagnostic PSG and respiratory testing for them, and continued to submit false or fraudulent claims for payment to the Government for those testing services.

163.    On December 22, 2018, during a Chamber of Commerce event at the hospital, CFO/Compliance Officer Johnson asked Relator whether there were "any patients scheduled tonight for sleep testing?"  Relator responded: "Yes, we have a full house." Johnson then asked whether any of those patients were covered by Medicare.  Relator responded in the affirmative, and Johnson smirked.  As all the members of PCMC Executive Administration were seated together,[43] Relator perceived this as an opportunity to share what he believed to be a solution; he offered: "The way to fix this problem is for you to sign a contract with Dr. Bipin Bhatt in Sebring.  He is board-certified in sleep medicine, and he is a staff physician at the HCA hospital in Sebring."  CNO Moland then asked whether the hospital could "just meet the supervision requirement on paper."  Relator replied that that was not a viable option, and offered to forward to CNO Moland written authority underlying his conclusion in that regard.[44]  Relator also advised that Dr. Bhatt had expressed a willingness to serve as PCMC's Medical Director/Supervising Physician, and was only asking $100.00 an hour for his time, inclusive

---

[43] PCMC Executive Administration consisted of the CEO, the CFO/Compliance Officer and the CNO (Chief Nursing Officer).  As previously mentioned, the hospital's CEO was Mark Dooley, and the hospital's CFO/Compliance Officer was Matthew Johnson. The hospital's CNO, Denise Moland, had only recently come on board as of this December 22, 2018 conversation.

[44] Relator's follow up email to CNO Molland on December 28, 2018 is attached to this Complaint and incorporated herein as **EXHIBIT "C"**.

of his travel time.  Relator further shared that Dr. Bhatt had proposed visiting PCMC on a monthly basis to meet with the staff and physically review the needs within the department, and would also be available by phone on a daily basis to the staff performing the diagnostic PSG and respiratory testing at PCMC.  CNO Moland asked Relator to contact Dr. Bhatt to confirm his continued interest and then to advise her accordingly.

164.    Within the next few days, Relator spoke by phone with Dr. Bhatt and confirmed his continued willingness to serve as Medical Director/Supervising Physician.  On December 28, 2018, Relator emailed CNO Moland to apprise her of the same.

165.    In the intervening 6 weeks, however, no corrective measures were implemented by PCMC Executive Administration.  Notwithstanding the fact that the hospital continued to operate in clear breach of at least three separate federal regulations, PCMC continued to accept patients covered under Medicare, Medicaid and other Federal Health Care Programs, continued to perform diagnostic PSG and respiratory testing for them, and continued to submit false or fraudulent claims for payment to the Government for those testing services.

166.    Furthermore, when Relator contacted Dr. Bhatt directly, he advised that no one from PCMC had reached out to him concerning the Medical Director/Supervising Physician role at PCMC.

167.    On January 29, 2019, Relator emailed CNO Moland urging her to contact Dr. Bhatt to discuss the issue of Supervising Physician/Medical Director.

168.    In a subsequent conversation Relator had with Dr. Bhatt, the latter stated that he had not been contacted by any member of the Executive Administration of PCMC. Accordingly, Relator sought and was granted an appointment with CNO Moland to follow up

52

on the status of Executive Administration's decision regarding Dr. Bhatt's engagement *vel non* as Medical Director/Supervising Physician.

169.    The meeting between Relator and Moland was scheduled to occur on February 11, 2019 at 4:00 p.m.  However, at 3:30 p.m., Relator was advised by CNO Moland's executive secretary, Noemi Alvarez, that Moland would not be able to attend.

170.    Relator then was able to reschedule the meeting for February 12, 2019 at 1:00 p.m.  However, at 12:00 noon on February 12, 2019, Ms. Alvarez contacted Relator to advise that this rescheduled meeting had also been canceled.

171.    At 4:00 p.m. that same day, February 12, 2019, Relator was informed by Hartzell that PCMC Executive Administration had decided to close the Sleep Lab and terminate the employment of all Sleep Lab employees.[45]

172.    Relator was stunned by PCMC's decision to terminate the Sleep Lab operations. Sleep Lab revenues had been growing, and Sleep Lab operations had proven quite profitable for the hospital over a several year time frame.  In his conversation with Relator, Hartzell was unable to offer any rationale for the hospital's decision.

173.    The termination letter received by Relator, dated February 12, 2019, was equally unrevealing. It stated:

> After a careful review of how we can best support the company's efforts, the decision has been made to discontinue providing Sleep Lab Services. Based on this decision all positions will be eliminated.

---

[45] Incongruously, the respiratory therapists who also had been performing diagnostic testing at PCMC in violation of federal regulations were *not* terminated.  Upon information and belief, after March 1 2019 and continuing unabated to date, PCMC continued to accept patients covered under Medicare, Medicaid and other Federal Health Care Programs, perform diagnostic respiratory testing for them, and submit false or fraudulent claims for payment to the Government for those testing services.

A true and correct copy of that termination letter is attached to this Complaint and incorporated herein as **EXHIBIT "D"**.[46]

174.    As will be explained further in Count VII of this Complaint, Relator's termination was an unlawful, retaliatory act, *i.e.*, an act taken as the direct consequence of his efforts in pressing for the hospital to correct its failure to comply with governing federal regulatory requirements.

175.    Throughout his employment with PCMC, Relator received uniformly excellent performance evaluations and the Sleep Lab had operated very profitably. At no time prior to receiving his notice of termination had anyone associated with PCMC made mention of any matter that would conceivably suggest that the scuttling of all Sleep Lab operations was an option under consideration by PCMC.

176.    And, from an objective business perspective, it made no logical sense for the hospital to eliminate a very profitable segment of its operations when compliance with the federal regulations that Relator had long advocated for necessitated but modest additional expenditures by the hospital.[47]

### H.    Quantifying the Actual Damages Sustained by the U.S. Government

177.    Throughout the Fraudulent Billing Period, Defendants submitted thousands of false or fraudulent claims to Medicare, Medicaid and other Federal Healthcare Programs for

---

[46] Relator's termination letter was issued under CEO Dooley's signature and concluded with: "I have enjoyed working with you and hope the best for you both personally and professionally. Please let me know if there's anything I can do to further assist you during this transition process."

[47] As alleged *supra*, Relator was far from alone in advocating that PCMC make the necessary changes to bring the Sleep Lab into compliance with governing legal requirements. Kimberly Moore, who served as Director of Cardiopulmonary Services until her employment was terminated in July 2016, had advocated to PCMC Executive Administration and HCA's risk management, regulatory compliance and legal departments for such changes. The current Director of Cardiopulmonary Services, David Hartzell, even pleaded with PCMC's CEO Dooley and CFO/Compliance Officer Johnson: "Help me get legit with this."

diagnostic PSG and respiratory testing services that they knew, or clearly should have known, were ineligible for payment.

178. Throughout the Fraudulent Billing Period, the amounts billed by Defendants to Medicare for each PSG and CPAP test service varied only slightly from year to year.[48]

179. Throughout the Fraudulent Billing Period, the average amount billed by Defendants to Medicare for each PSG test performed at PCMC and coded under CPT 95810 was approximately $640.00.[49]

180. Throughout the Fraudulent Billing Period, the average amount billed by Defendants to Medicare for each CPAP test performed at PCMC and coded under CPT 95811 was approximately $670.00.

181. Throughout the Fraudulent Billing Period, the average amount billed by Defendants to Medicaid a secondary insurance for each PSG test performed at PCMC and coded under CPT 95810 was approximately $350.00.

182. Throughout the Fraudulent Billing Period, the average amount billed per patient for DME equipment and supplies purchases caused by the Defendants' false or fraudulent submissions of PSG and CPAP tests was approximately $4,370.00 over a five-year period.[50]

---

[48] CMS created an online resource to permit providers to identify the amounts payable for specific services at : https://www.cms.gov/apps/physician-fee-schedule/search/search-criteria.aspx The amounts set forth in this Complaint were checked against the CMS published amounts, and are fully consistent therewith.

[49] The amounts posited in paragraphs 178 and 179 are inclusive of the physician portion of the false or fraudulent billing.

[50] The approximate first year billings per patient for DME equipment and supplies was approximately $1,250.00, and $780.00 for years 2 through 5. The CPT codes for such equipment and supplies are E0601, A4604, A7034, A7035, A7036, A7038, A7046 and E5062.

183. Throughout the Fraudulent Billing Period (and upon information and belief continuing unabated to date), Defendants have submitted false or fraudulent billings to Medicare, Medicaid and all other federally funded programs for respiratory diagnostic tests (EKGs, EEGs and Pulmonary Function Tests).

184. Additionally, after he was hired to work as a sleep lab technologist at PCMC, Relator personally reviewed hospital records reflecting the PSG and CPAP tests administered to patients during the time period of 2009-2013. Relator alleges that, based upon this review, PCMC's Sleep Lab performed over 600 PSG and CPAP tests during the time period of 2009-2013. LifePoint submitted, or caused to be submitted, false or fraudulent billings to Medicare, Medicaid and all other federally funded programs for each one of them. Furthermore, LifePoint caused to be submitted false or fraudulent billings to Medicare, Medicaid and all other federally funded programs for DME equipment and supplies purchases caused by its false or fraudulent submissions of PSG and CPAP tests.[51]

185. Upon information and belief, the total amount of false or fraudulent billing of Medicare, Medicaid, and all other federally funded programs by Defendants has exceeded $8,000,000 to date. Upon information and belief, and in accordance with the dictates of 31 U.S.C. 3729(a)(1), Defendants are liable to the United States of America in an amount *not less than* $276,186,000.00, and potentially in excess of $528,394,000.00.[52]

---

[51] As alleged in paragraphs 106 through 113 of this Complaint, LifePoint knew or should have known of its obligation under federal law to self-report and refund all monies received as a result of said false or fraudulent billings. And, as alleged in paragraph 67 through 69 of this Complaint, HCA and Putnam Community Medical Center of North Florida, LLC bear joint and several responsibility for such false or fraudulent billings and failure to self-report and refund all monies received as a result of said false or fraudulent billings.

[52] Pursuant to 31 U.S.C. 3729(a)(1), the actual damages amount of $8,000,000.00+ is to be trebled by the Court. Additionally, a civil penalty of not less than $11,463.00 and not more than $22,927.00 - adjusted for inflation - is to be assessed for each false or fraudulent claim. Upon information and belief, *at least* 22,000 separate false or fraudulent claims have been presented to, and paid by, the United States of America to date.

## VI.     THE CAUSES OF ACTION

### Count I - Violation of the Federal False Claim Act - 31 U.S.C 3729(a)(1)(A)

186.    Relator realleges and incorporates by reference paragraphs 1 through 171, and 177 through 185, of this Complaint as though fully set forth herein.

187.    Through the various acts and omissions described above, Defendants, and their agents and employees, in reckless disregard for or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and upon information and belief are still presenting or causing to be presented, to the United States of America, false and fraudulent claims, records and statements in order to obtain payment or approval of payment for healthcare services that were and are ineligible for payment, in violation of 31 U.S.C. 3729(a)(1)(A).

188.    The United States of America, unaware of the falsity of the claims, records and statements made by the Defendants, and in reliance on the accuracy and integrity of such claims, records and statements, paid, and upon information and belief continues to pay, for healthcare services that were and are ineligible for payment.

189.    As a result of the various acts and omissions described above, the United States of America has been, and continues to be, severely damaged.

### Count II - Violation of the Federal False Claim Act - 31 U.S.C 3729(a)(1)(B)

190.    Relator realleges and incorporates by reference paragraphs 1 through 171, and 177 through 185, of this Complaint as though fully set forth herein.

191.    Through the various acts and omissions described above, Defendants, and their agents and employees, in reckless disregard for or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made,

use, or caused to be made or used, and upon information and belief are still making, using, or causing to be made or used, to the United States of America, false records or statements material to false or fraudulent claims for payment or approval of payment for healthcare services that were ineligible for payment, in violation of 31 U.S.C. 3729(a)(1)(B).

192.    The United States of America, unaware of the falsity of the claims, records and statements made by the Defendants, and in reliance on the accuracy and integrity of such claims, records and statements, paid, and upon information and belief continues to pay, for healthcare services that were and are ineligible for payment.

193.    As a result of the various acts and omissions described above, the United States of America has been, and may continue to be, severely damaged.

### Count III - Violation of the Federal False Claim Act - 31 U.S.C 3729(a)(1)(G)

194.    Relator realleges and incorporates by reference paragraphs 1 through 171, and 177 through 185, of this Complaint as though fully set forth herein.

195.    Defendants, at all times material to this action, had and continue to have an ongoing legal obligation to report and disclose overpayments to the United States of America pursuant to, *inter alia*, 42 U.S.C. 1320a-7a, b, c and d; 42 U.S.C. 1395u; 42 C.F.R. 401.601, 405.377, 405.378; 42 C.F.R. 405.301-379; 42 C.F.R. 489.20; 42 C.F.R. 489.40-41; but failed to do so.

196.    Through the various acts and omissions described above, Defendants, and their agents and employees, in reckless disregard for or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased an obligation to pay or transmit money or

property to the United States of America relating to payments had and received for healthcare services that were ineligible for payment, in violation of 31 U.S.C. 3729(a)(1)(G).

197.    As a result of the various acts and omissions described above, the United States of America has been, and continues to be, severely damaged.

**Count IV - Violation of the Florida False Claim Act – Fla. Sta. s.68.083(2)(a)**

198.    Relator realleges and incorporates by reference paragraphs 1 through 171, and 177 through 185, of this Complaint as though fully set forth herein.

199.    This is a civil action brought by Relator, on behalf of the State of Florida, against Defendants under the Florida False Claims Act, Fla. Stat. 68.083(2).

200.    Through the various acts and omissions described above, Defendants, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or cause to be presented, and upon information and belief, continue to knowingly present or cause to be presented, to an officer or employee of the State of Florida, or its agencies, false or fraudulent claims for payment or approval, in violation of Fla. Stat. 68.082(2)(a).

201.    The State of Florida, or its agencies, unaware of the falsity of the claims, records and statements made by the Defendants, and in reliance on the accuracy and integrity of such claims, records and statements, paid, and upon information and belief continues to pay, for healthcare services that were and are ineligible for payment.

202.    As a result of the various acts and omissions described above, the State of Florida, or its agencies, have been, and may continue to be, severely damaged.

**Count V - Violation of the Florida False Claim Act – Fla. Sta. 68.083(2)(b)**

203.    Relator realleges and incorporates by reference paragraphs 1 through 171, and 177 through 185, of this Complaint as though fully set forth herein.

204.    This is a civil action brought by Relator, on behalf of the State of Florida, against Defendants under the Florida False Claims Act, Fla. Stat. 68.083(2).

205.    Through the various acts and omissions described above, Defendants, and their agents and employees, in reckless disregard for or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, use, or caused to be made or used, and upon information and belief are still making, using, or causing to be made or used, to an officer or employee of the State of Florida, or its agencies, false records or statements material to false or fraudulent claims for payment or approval of payment for healthcare services that were ineligible for payment, in violation of Fla. Stat. 68.082(2)(b).

206.    The State of Florida, or its agencies, unaware of the falsity of the claims, records and statements made by the Defendants, and in reliance on the accuracy and integrity of such claims, records and statements, paid, and upon information and belief continues to pay, for healthcare services that were and are ineligible for payment.

207.    As a result of the various acts and omissions described above, the State of Florida, or its agencies, have been, and may continue to be, severely damaged.

**Count VI - Violation of the Florida False Claim Act – Fla. Sta. 68.083(2)(g)**

208.    Relator realleges and incorporates by reference paragraphs 1 through 171, and 177 through 185, of this Complaint as though fully set forth herein.

209.    This is a civil action brought by Relator, on behalf of the State of Florida,

against Defendants under the Florida False Claims Act, Fla. Stat. 68.083(2).

210.    The State of Florida, or its agencies, unaware of the falsity of the claims, records

and statements made by the Defendants, and in reliance on the accuracy and integrity of such

claims, records and statements, paid, and upon information and belief continues to pay, for

healthcare services that were and are ineligible for payment.

211.    Defendants, and their agents and employees, in reckless disregard for or

deliberate ignorance of the truth or falsity of the information involved, or with actual

knowledge of the falsity of the information, concealed or improperly avoided or decreased an

obligation to pay or transmit money or property to an officer or employee of the State of

Florida, or its agencies, relating to those payments had and received for healthcare services

that were ineligible for payment, in violation of Fla. Stat. 68.082(2)(g).

212.    As a result of the various acts and omissions described above, the State of

Florida, or its agencies, have been, and continues to be, severely damaged.

### Count VII - Violation of the Federal False Claim Act - 31 U.S.C 3730(h)
(Unlawful Retaliation Claim Against HCA and Putnam Community
Medical Center of North Florida, LLC)

213.    Relator realleges and incorporates by reference paragraphs 1 through 58, and

70 through 185, of this Complaint as though fully set forth herein.

214.    Relator suffered an adverse employment action for voicing opposition to an

employment practice at PCMC, and encouraging compliance with 42 C.F.R. 410.32 and the

WPS LCD requiring that providers providing diagnostic PSG testing (and respiratory testing

related thereto) have a properly credentialed physician with recognized sleep medicine

expertise on staff to supervise such testing.

215.    Relator was, at all times material to this Complaint, an "employee" pursuant to 31 U.S.C. 3730(h)(1).

216.    HCA and Putnam Community Medical Center of North Florida, LLC acted in concert and conspired to terminate Relator from his employment as the result of, and in retaliation for, his investigation and reporting of, and efforts to seek to correct, the failure of PCMC to comply with 42 C.F.R. 410.32 and the WPS LCD, and for encouraging compliance therewith.

217.    Relator was terminated as the direct and proximate consequence of his voluntarily performing lawful acts to investigate, report and seek to correct one or more violations of the False Claims Act.  Such voluntary lawful acts of Relator constituted activities protected by the False Claims Act.

218.    HCA and Putnam Community Medical Center of North Florida, LLC each knew, or should have known, that the decision to terminate Relator was unlawful under 31 U.S.C. 3730(h).

219.    As consequence of the unlawful retaliation engaged in by HCA and Putnam Community Medical Center of North Florida, LLC, Relator has suffered and continues to suffer damages.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Willard Revels, as Relator, prays for judgment to be entered against Defendants as follows:

1.      that Defendants be ordered to cease and desist from submitting, or causing to be submitted, any further false claims, or further violating 31 U.S.C. 3729 et seq., and Fla. Stat. 68.081 et seq.;

2.      that judgment be entered in favor of the United States of America and Relator against the Defendants in an amount not less than $276,186,000.00 and potentially in excess of $528,394,000.00, in accordance with 31 U.S.C. 3729(a);

3.      that judgment be entered in favor of the State of Florida and Relator against the Defendants in an amount representing the sum of each and every false or fraudulent claim, trebled in accordance with Fla. Stat. 68.082(2), plus a civil penalty of not less than $11,463.00 and no more than $22,927.00 per claim, as provided by Fla. Stat. 68.082(2);

4.      that Relator be awarded the maximum amount permissible according to 31 U.S.C. 3730(d) and Fla. Stat. 68.085;

5.      that Defendants be ordered to disgorge all sums by which they each have been unjustly and unlawfully enriched by their unlawful conduct;

6.      that judgment be entered in favor of Relator against HCA and Putnam Community Medical Center of North Florida, LLC for all appropriate relief pursuant to 31 U.S.C. 3730(h), including but not limited to: (a) two times the amount of compensatory backpay and benefits due Relator; (b) interest on said backpay and benefits due Relator; (c) other compensatory damages proximately caused by the unlawful retaliatory acts of said Defendants, including those incurred in having to travel out of the State in order to interview for new comparable employment and all relocation expenses incurred; and (d) costs and reasonable attorney's fees;

7.      that judgment be entered in favor of the United States of America and Relator against the Defendants in an amount representing the sum of all recoverable costs incurred in this action, including, but not limited to, filing fees, expert witness fees, and all reasonable attorney's fees incurred by Relator in the prosecution of this action, as may be apportioned among the Defendants by this Court; and

8.      that the United States of America and Relator be granted such other and further relief as this Court finds just and proper.

## VIII.   DEMAND FOR JURY TRIAL

**Relator hereby demands a trial by jury of all issues so triable in this action.**

Respectfully submitted this 16th day of July 2019.

> */s/ James A. Gustino*
> Florida Bar No. 612499
> JAMES A. GUSTINO, P.A.
> P.O. Box 784959
> Winter Garden, Florida 34778-4959
> *(407) 625-6700 / telephone*
> *(407) 641-9333 / facsimile*
> jgustino@gustinolaw.com */ email 1*
> gustinolaw@protonmail.com */ email 1*
>
> Counsel to Relator, Willard Revels