**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA,
THE STATE OF FLORIDA,                    CASE NO. 3:19-cv-834-J-32JRK
*ex rel* WILLARD REVELS,

              Plaintiffs,              <u>**JURY TRIAL DEMANDED**</u>

v.

PUTNAM COMMUNITY MEDICAL
CENTER OF NORTH FLORIDA, LLC,

              Defendant.
_____/

<u>**FIRST AMENDED COMPLAINT AND JURY DEMAND**</u>

Willard Revels (the "Relator") brings this action on behalf of the United States of America and the State of Florida against Defendant, Putnam Community Medical Center of North Florida, LLC ("Defendant") pursuant to the qui tam provisions of the Federal False Claims Act, 31 U.S.C. §3729 *et seq*., and the qui tam provisions of the Florida False Claims Act, Fla. Stat. §68.081 *et seq*.

## I.     INTRODUCTION

1.    This is an action seeking to recover civil penalties and damages brought by Relator on behalf of the United States of America and the State of Florida arising from Defendant's knowingly: (a) presenting, or causing to be presented, false or fraudulent claims to the United States of America and the State of Florida in violation of 31 US §3729(a)(1)(A) and Fla. Sta. §68.083(2)(a); (b) making, using, or causing to be made or used, false records or statements material to false or fraudulent claims to the United States of America and the State

1

of Florida in violation of 31 US §3729(a)(1)(B) and Fla. Sta. §68.083(2)(b); and (c) concealing, or knowingly and improperly avoiding or decreasing, obligations to pay or transmit money to the United States of America and the State of Florida in violation of 31 US §3729(a)(1)(G) and Fla. Sta. §68.083(2)(g).  Defendant's violations of federal and state law occurred over a 10-year period, and upon information and belief, continues to date relative to the diagnostic respiratory testing services administered to patients at Putnam Community Medical Center ("PCMC") in Palatka, Florida.

2.      This action is predicated upon Defendant's knowing submission of tens of thousands of ineligible claims to, and failing to self-report and timely reimburse – or reimburse at all – millions of dollars unlawfully collected from the following government-funded programs: (a) the federally funded Medicare Program, Title XVIII of the Social Security Act, 42 U.S.C. 1395 *et seq*., including Medicare Parts A, B and C; (b) the federally and state-funded Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. 1396 *et seq*., inclusive of Medicaid managed health plans; (c) Tricare[1]; (d) Champ VA[2]; (e) Veteran's Choice[3]; and (f) the Federal Railroad Retirement program[4] (collectively, the "Federal Health Care Programs") for polysomnographic studies ("PSGs"), CPAP titration studies ("CPAPs"), electrocardiogram tests ("EKGs") and pulmonary function tests ("PFTs") administered to PCMC patients.

---

[1] TRICARE is a federally funded program of the United States Department of Defense that provides medical benefits to the spouses and unmarried children of servicemembers and reservists order to active duty for 30 days or longer, the unmarried spouses and children of deceased servicemembers, and retired servicemembers. See 10 U.S.C. §1071, *et seq*.; 32 CFR 199.1, *et seq*.

[2] Champ VA is a federally funded program that furnishes medical benefits to spouses and children of deceased were permanently disabled veterans.

[3] Veteran's Choice is a federally funded program that offers medical benefits to eligible veterans electing to receive care at a community provider rather than at a VA facility.

[4] The Federal Railroad Retirement program as a federally funded program that offers medical benefits to eligible retired railroad employees and their family members.

Defendant's deliberate actions and omissions also knowingly and proximately *caused* physicians and providers of medical durable equipment ("DME") to present thousands of false or fraudulent claims for payment or approval to the Federal Health Care Programs in direct reliance upon those improperly administered PSGs, CPAPs, EKGs, and PFTs (collectively, the "Diagnostic Tests").[5]

3.      All claims at issue in this action are false or fraudulent because Defendant presented, or caused to be presented, claims falsely depicting the Diagnostic Tests done at PCMC as having been supervised by a physician when Defendant's CEOs, Compliance Officers, and Directors of Cardiopulmonary Services knew they had not – and never had – been.

## II.      **PARTIES**

4.      The United States of America is a Plaintiff to this action on behalf of HHS, CMS, and seeks redress of injuries to the Federal Health Care Programs.

5.      The State of Florida is a Plaintiff to this action and seeks redress of injuries to its Medicaid and Medicaid Managed Programs.

---

[5] Medicare is a government health insurance program for those 65 years or older, and for those with certain disabilities. 42 U.S.C. §§426, 426A.  Medicare is administered by the Centers for Medicare & Medicaid Services ("CMS"), which is part of the U.S. Government's Department of Health and Human Services ("HHS"). CMS contracts with private entities, Medicare Administrative Contractors ("MACs") who serve as its authorized agents in analyzing and paying claims submitted by healthcare providers. See, e.g., 42 U.S.C. §1395h; 42 C.F.R §421.3, 421.100.  A new Part C of the Medicare program was established by Congress in 1999. That legislation authorized CMS to contract with private organizations to offer a variety of health plan options to Medicare beneficiaries. These health plans provide all Medicare Parts A and B benefits, and most offer additional benefits beyond those covered under the Original Medicare program. The program of plans available under Medicare Part C later became known as the Medicare Advantage Program, and the organizations providing those plan programs under Part C are now called Medicare Advantage Organizations ("MAOs"). MAOs receive federal funding which enables them to offer their private health plans to Medicare eligible seniors. All MAOs enter contracts with CMS, and are subject to its regulatory oversight and control. See Report to Congress: Alternative Payment Models and Medicare Advantage (cms.gov)

6.     Relator, Willard Revels ("Relator"), *sui juris,* was employed as a polysomnography technologist at PCMC from December 2013 through May 2015, at which time he was promoted by PCMC to Manager of the Sleep Lab. Relator served as the Manager of PCMC's Sleep Lab through March 1, 2019, the date his employment was terminated as the result of an alleged reshuffling of HCA "business priorities" that abruptly ended all Sleep Lab services performed at PCMC. Relator is currently employed as a registered polysomnography technologist ("RPSGT") in Oklahoma, where he resides.

7.     Defendant is a Florida limited liability company that owns and operates PCMC, a 99-bed acute care facility affiliated with and, upon information and belief, derivatively owned in whole or part and/or actively managed and controlled by HCA Healthcare, Inc. ("HCA"), the largest hospital network in the United States.[6]

### III.     JURISDICTION AND VENUE

8.     This Court has jurisdiction over the subject matter of this action pursuant to 31 U.S.C. §3732(a), 28 U.S.C. §1331, and 28 U.S.C. §1345.

9.     This Court also has original jurisdiction of the Florida False Claims Act counts pursuant to 31 U.S.C. §3732(b), as those counts are brought under Florida law to recover funds paid by the State of Florida and arise from the same transactions or occurrences providing the basis for the Federal False Claim Act counts.

---

[6] Prior to Defendant's acquisition of PCMC, the hospital was owned by an affiliate  entity of LifePoint Hospitals, Inc. (Putnam Community Medical Center, LLC), and  actively managed and/or controlled by LifePoint Hospitals, Inc. Upon information and belief, Relator alleges that Defendant became legally responsible for all violations committed by Putnam Community Medical Center, LLC pursuant to 42 C.F.R. §489.18's Change of Ownership (CHOW) regulation. However, although public record sources confirm Defendant's ownership of PCMC, until discovery reveals the details regarding the sale of PCMC to Defendant, Relator wishes to be clear that the further allegations in paragraph 6 and this note 5 are based upon current information and belief solely. Should discovery reveal Relator's current belief to be incorrect, Relator shall promptly seek leave of court to amend his pleading to reflect the facts of PCMC's change of ownership status.

10.     This Court also has supplemental jurisdiction of the Florida False Claims Act counts pursuant to 28 U.S.C. §1367.

11.     This Court has personal jurisdiction over the Defendant pursuant to 28 U.S.C. §3732(a) as it is found in and transacts business in Palatka, Florida, which is located within the Middle District of Florida.

12.     Venue is proper in this District pursuant to 31 U.S.C. §3732(a) as Defendant is found in and transacts business in, and the violations of law occurred in, this District.

13.     The claims alleged by Relator herein are not based upon allegations or transactions that are the subject of a civil suit or an administrative civil money penalty proceeding in which the United States of America is a party. See 31 U.S.C. §3730(e)(3). Relator is the original source of the facts set forth in this First Amended Complaint (the "FAC") that give rise to the legal claims asserted herein. Such legal claims are not reliant upon publicly disclosed information.

14.     Relator has complied with all conditions precedent to the filing of this action, including having made the voluntary disclosures to the United States of America as required by 31 U.S.C. §3739(b)(2). Further, Relator has made the same voluntary disclosures to the State of Florida.

## IV.     ALLEGATIONS COMMON TO ALL COUNTS

15.     At all times material to this FAC, virtually all patients receiving health care services at PCMC were eligible to receive benefits under one or more of the Federal Health Care Programs.

16.     At all times material to the FAC, PCMC was operated as a certified medical provider under Medicare and Medicaid, and thereby eligible to bill each of the Federal Health Care Programs for the Diagnostic Tests at issue in this action.

## PSG and CPAP Testing

17.     At all times material to the FAC, PCMC conducted PSGs on patients suffering from sleep disorders such as obstructive sleep apnea ("OSA"), a potentially fatal condition where the patient stops breathing for extended periods of time while asleep.[7]

18.     PSGs are used to diagnose OSA, as well as other sleep disorders, and typically involve overnight patient stays at PCMC's Sleep Lab (although some PSGs are administered to patients at their homes). For the PSG, the patient is hooked up with approximately 30 leads which are used to monitor, among other things, the patient's heart rate, breathing and body movement during sleep.

19.     Results of the PSG tests are then "scored" by sleep technicians (who note the data indicative of a sleep disorder), and the raw data and scored sleep technician reports ("Technical Reports") are forwarded to physicians granted "sleep medicine" privileges by

---

[7]   The Mayo Clinic advises that obstructive sleep apnea can lead to a multitude of serious health problems, including stroke, high blood pressure, heart disease and sudden death:

> Sudden drops in blood oxygen levels that occur during obstructive sleep apnea increase blood pressure and strain the cardiovascular system. Many people with obstructive sleep apnea develop high blood pressure (hypertension), which can increase the risk of heart disease. The more severe the obstructive sleep apnea, the greater the risk of coronary artery disease, heart attack, heart failure and stroke. Obstructive sleep apnea increases the risk of abnormal heart rhythms (arrhythmias). These abnormal rhythms can lower blood pressure. If there's underlying heart disease, these repeated multiple episodes of arrhythmias could lead to sudden death.

https://www.mayoclinic.org/diseases-conditions/obstructive-sleep-apnea/symptoms-causes/syc-20352090

The Division of Sleep Medicine at Harvard Medical School echoes these same concerns and observed that former NFL Hall of Fame defensive end Reggie White "died of cardiac and pulmonary problems [at age 43] that were likely intensified by his sleep apnea."

http://healthysleep.med.harvard.edu/sleep-apnea/living-with-osa/health-consequences#

PCMC's Credentialing Committee[8] (the "Sleep Medicine Physicians"). Sleep Medicine Physicians review and interpret the raw data and Technical Report for the patient, and diagnose the patient's condition, *i.e.*, whether the patient suffers from OSA and/or some other sleep disorder.

20.     The Technical Reports and the PCMC Sleep Medicine Physician's dictated "Interpretation Report" are then provided to the patient's treating physician, *i.e.*, the primary or specialist physician who had referred the patient to PCMC for the PSG.[9]  If the patient's score on the PSG warrants it, the patient's treating physician in virtually 100% of cases prescribes a follow-up CPAP study to be conducted at PCMC. The patient again is admitted for an overnight stay to the PCMC Sleep Lab, and the sleep technician administers another PSG on the patient; however, for CPAP studies the patient wears a mask and is connected to a CPAP machine to assist with the patient's breathing.[10] Throughout the CPAP testing period, the sleep technician is adjusting the mask and calibrating the CPAP machine settings to provide effective relief to the patient.

---

[8] PCMC's website states: "Providing quality, patient-centered care is our mission at Putnam Community Medical Center. That's why it's important that we partner with physicians and other medical professionals (Providers) who have the necessary qualifications and credentials to provide quality, safe and compassionate medical care to our community. Our rigorous credentialing process follows Federal and State regulatory requirements, as well as accreditation standards for verifying the education, training, licensure and current competence in order to ensure that privileges are only granted to qualified Providers."  See  Credentialing | Putnam Community Medical Center | Palatka, FL (pcmcfl.com) (last accessed January 20, 2021).

[9] CMS sometimes refers to this treating physician as "attending physician" in its publications, but throughout this FAC, Relator shall use the term "treating physician" to describe this physician's role.

[10] A CPAP machine is a medical device used to keep a patient's airway open during sleep to promote unobstructed breathing. The Centers for Medicare & Medicaid Services ("CMS") broadly defines a CPAP device as follows: "a machine that introduces air into the breathing passages at pressures high enough to overcome obstructions in the airway in order to improve airflow." 42 C.F.R. §424.57(a).  CPAP machines are classified as DME and are considered "medically reasonable and necessary" to treat OSA and other sleep disorders.

21.     After the CPAP test is completed, the results are sent to the patient's treating physician. After reviewing the CPAP test results, the patient's treating physician typically meets with the patient to review and explain the results of the CPAP test and prescribe a CPAP machine and other related DME for the patient's benefit.

## EKG and PFT Testing

22.     At all times material to the FAC, PCMC's respiratory therapists administered EKGs on patients suffering from or suspected of numerous cardiac conditions requiring clinical treatment. These same respiratory therapists also were responsible to administer PFTs to patients suffering from or suspected of various pulmonary conditions requiring clinical treatment.

23.     The critical importance of *timely* and *precise* EKG and PFT tests to patient care is amply reflected in the medical literature, and errors or delays – particularly in EKG testing – can lead to fatal consequences for the patient.[11]

24.     As in PSG and CPAP testing, the diagnostic EKG and PFT tests would be forwarded to a physician at PCMC who would review and interpret the data and dictate an Interpretation Report that would be provided to the patient's treating physician.  Additionally, physicians at PCMC relied upon the accuracy of those tests in providing appropriate treatment to those patients while admitted to PCMC.

---

[11] See, e.g., Scholz, Maier, et al., "Impact of Treatment Delay on Mortality in ST-Segment Elevation Myocardial Infarction (STEMI) Patients Presenting with and without Haemodynamic Instability: Results from the German Prospective Multicentre FITT- STEMI Trial," *European Heart Journal*, Vol. 39, 1065-1074 (2018); Rosen, Koppikar, et al., "Common ECG Lead Placement Errors. Part II: Precordial Misplacements," *International Journal of Medical Students*, Vol. 2, Issue 3 (July-Oct 2014); Kligield, Geddes, et al., "Recommendations for the Standardization and Interpretation of the Electrocardiogram," *Circulation*, Vol. 115, 1306-1324 (2007); Graham, Steenbruggen, et al., "Standardization of Spirometry 2019 Update: An Official American Thoracic Society and European Respiratory Society Technical Statement," *American Journal of Respiratory and Critical Care Medicine*, Vol. 200, No. (October 15, 2019); Brusasco, Crapo, et al., "General Considerations for Lung Function Testing," *European Respiratory Journal*, Vol. 26, No. 1 (2005).

**Defendant's Knowledge of Regulatory Noncompliance
in the Administration of PSGs, CPAPs, EKGs and PFTs**

25.     Since at least 2009 and continuing through and until at least March 1, 2019 (the "Fraudulent Billing Period"), Defendant (and the predecessor owner of PCMC) presented or caused to be presented tens of thousands of false or fraudulent claims to the Federal Health Care Programs for Diagnostic Tests that failed to meet threshold eligibility standards.

26.     Specifically, it was known by Defendant (and the predecessor owner of PCMC) that: (1) providers could bill the Federal Health Care Programs only for Diagnostic Tests performed that were both "reasonable and necessary," and (2) Diagnostic Tests only qualified as "reasonable and necessary" under 42 C.F.R. §410.32 ("§410.32") if – and only if – performed by sleep technicians and respiratory therapists who were under general physician supervision and control.[12]

27.     Although §410.32 did not, and does not, require that a physician be physically present during the administration of each of the Diagnostic Tests, the "general supervision" standard expressly required that a physician be responsible for "overall direction and control" of all such testing throughout the Fraudulent Billing Period.  And such "overall direction and control" was, and is, defined in §410.32 to require that the responsible physician: (1) furnish ongoing training of all personnel performing the tests to ensure their competence, and (2) provide ongoing maintenance evaluations of the equipment and supplies utilized by the nonphysician personnel in administering the tests to ensure that the equipment was working properly and that the nonphysician personnel had all supplies necessary to properly perform the tests. See §410.32(b)(3)(i).

---

[12]  At all times material to the FAC, 42 C.F.R. §410.32(b)(1) unambiguously declared, and continues to declare, that "[s]ervices furnished without the required level of supervision are *not* reasonable and necessary" (emphasis added).

28.     Notwithstanding §410.32's explicit requirements, at no time during the Fraudulent Billing Period did any physician provide ongoing training – or *any* training – to the nonphysician personnel performing the Diagnostic Tests at PCMC. Furthermore, at no time during the Fraudulent Billing Period did any physician: (a) provide an emergency contact number to the nonphysician personnel administering the Diagnostic Tests should an issue arise warranting physician involvement (see 73 Fed. Reg. 223, p. 60583); (b) monitor and evaluate the competency of the nonphysician personnel performing the Diagnostic Tests; (c) have sufficient knowledge and training to properly administer the Diagnostic Tests should physician intervention become warranted; or (d) have sufficient knowledge and training to meaningfully conduct maintenance reviews of the necessary equipment and supplies utilized by the nonphysician personnel in performing the Diagnostic Tests.

29.     At all times material to this FAC, the §410.32 standards were well publicized by CMS, and Defendant was on actual and constructive notice of its requirements. Indeed, the §410.32 standards were first issued on October 31, 1997. CMS subsequently issued a formal *Program Memorandum* on April 19, 2001 to highlight to hospitals and other providers the need for physician supervision of diagnostic tests,[13] and has repeatedly reaffirmed the importance of physician supervision of diagnostic testing in published rule pronouncements.[14] Further, as shall be detailed hereinafter, Defendant's CEOs, Compliance Officers, and Directors of Cardiopulmonary Services each personally knew that Defendant had not – *or ever had* – been compliant with the requirements of §410.32.

---

[13] See HHS Program Memorandum B-01-28 (April 19, 2001).

[14] See, e.g., 73 Fed. Reg. 223, p. 6703 (Nov. 18, 2008).

**History Relevant to FAC**

30.     In May 2013, Relator was solicited by Kimberly Moore, PCMC's then-Director of Cardiopulmonary Services ("DCPS"), to consider employment at PCMC's Sleep Lab. Moore and Relator had worked together at Highlands Regional Medical Center in Sebring, Florida ("HRMC").  From August 2010 through her departure in February/March 2013, Moore served as the DCPS at HRMC; was Relator's direct supervisor; and had been positively impressed by Relator's work performance, integrity, professionalism, and dedication to patient care. Accordingly, when Moore perceived the need for improvements to be made to PCMC's Sleep Lab shortly after she had been hired on at PCMC, she considered Relator a logical candidate.

31.     On or about May 28, 2013, Relator traveled to Palatka to inspect PCMC's Sleep Lab and speak with Moore concerning the opportunity. After examining the equipment and inquiring into the protocols at PCMC's Sleep Lab, however, Relator advised Moore that he could not consider employment there. Relator explained to Moore and PCMC's then-Chief Nursing Officer ("CNO"), Kari Bolin, that the equipment utilized in PCMC's Sleep Lab failed to meet federal requirements and he would not work at PCMC under those conditions.[15]

32.     In Bolin's presence, Moore asked Relator what specific actions he advised be taken given the facts he had learned. Relator was clear in his response; he stated that the PCMC Sleep Lab should be closed immediately and that the hospital should self-report the ineligible Medicare and Medicaid claims presented and paid during which time when federally noncompliant equipment had been used to perform PSG and CPAP testing on PCMC patients.

---

[15] At the time, Relator was informed by Moore that the PCMC had utilized the deficient equipment – *and billing Medicare and Medicaid for PSG and CPAP tests performed in reliance thereon* – since 2009.

33.     PCMC's Sleep Lab was closed very shortly after Relator's visit, and upon information and belief, Moore and/or Bolin shared Relator's findings and recommendations with PCMC's Risk Manager, Catherine Webb. Upon information and belief, Webb then briefed Susan Cherry, LifePoint's Director of Risk Management, concerning the matter and asked Cherry for guidance on appropriately handling the self-report issue. LifePoint ultimately determined that such self-reporting need not occur.

34.     PCMC subsequently acquired federally compliant equipment for its Sleep Lab and Moore approached Relator anew about prospective employment. Relator ultimately accepted an offer to work as a technologist in PCMC's Sleep Lab and commenced employment in December 2013.

35.     Between December 2013 and May 2015, Relator worked as a technologist in the Sleep Lab and reported directly to DCPS Moore.  During that time frame, Relator was an hourly employee with no supervisory or management responsibilities.

36.     During September 2014, newspapers in Palatka reported that The Sleep Medicine Center – an Independent Diagnostic Testing Facility (IDTF) with a clinic in Palatka – had settled False Claim Act charges brought by the Department of Justice ("DOJ"). This news was of particular interest to several PCMC employees since the owner of The Sleep Medicine Center was a former PCMC employee and had managed PCMC's Sleep Lab.

37.     In a subsequent conversation he had with Kim Moore, Relator mentioned that he had reviewed the DOJ website after learning of the news and discovered that one of the charges the DOJ had leveled at The Sleep Medicine Center involved its alleged failure to provide the required physician supervision of the sleep testing performed there.  Relator further

observed to Moore that – as far as he was aware – no physician supervision of the PCMC Sleep Lab was taking place, and that he had not received any physician training since his hiring.

38.    Moore indicated that she understood that Dr. Iftikhar Ahmad, who had the *title* of PCMC's Medical Director of Cardiopulmonary Services ("MDCPS"), had been providing the physician supervision federal law required.[16]

39.    Surprised to hear from Relator that Dr. Ahmad might not have been providing physician supervision of the Sleep Lab, Moore approached PCMC's then-CEO, Jerry Christine, to raise the matter. For her effort, Moore was tersely informed by Christine that contractual matters between the hospital and its physicians were *his* responsibility.

40.    In early March 2015, it was announced that HCA, through its HCA North Florida Division, had entered a contract with LifePoint to acquire PCMC.[17]  Upon information and belief, closing of the PCMC acquisition occurred on May 1, 2015.[18]

41.    Shortly thereafter, during May 2015, Relator received a promotion to become PCMC's Sleep Lab Manager.  In that role, he reported directly to Moore, who continued to serve as PCMC's DCPS.

42.    In his new role as Manager, Relator sought to do everything in his power to ensure that the PCMC Sleep Lab was being operated in compliance with all federal and state requirements. Relator first requested and received a copy of the hospital privileges of the two designated Sleep Medicine Physicians at PCMC, Dr. Iftikhar Ahmad and Dr. Kaushalendra Singh, to confirm and document that PCMC had granted sleep medicine privileges to them.

---

[16] Moore further noted that she had seen a copy of Dr. Ahmad's contract to serve as MDCPS in 2013.

[17] https://www.staugustine.com/article/20150305/business/303059939

[18] https://www.bizjournals.com/jacksonville/news/2015/05/12/putnam-county-medical-center-reopens-under-hca.html

43.     Relator thereafter scheduled a meeting with Dr. Ahmad at the latter's office to discuss Sleep Lab operations and document compliance with regulatory requirements.[19]  At the meeting, Relator advised he had recently been promoted to Manager of the Sleep Lab, was aware that Dr. Ahmad had been designated MDCPS, and wished Dr. Ahmad  to confirm or prescribe written policies for the Sleep Lab. Relator also requested the scheduling of biweekly meetings between them to ensure that the Sleep Lab was operating in accord with Dr. Ahmad's policies.[20]

44.     Dr. Ahmad told Relator that despite having signed the 2012 contract, he had never performed *any* duties as MDCPS and had never received compensation for doing so. Dr. Ahmad further indicated to relator that if PCMC's Executive Administration wished for him to serve as MDCPS, the financial terms of such an engagement would have to be revisited. He observed that PCMC recently had been acquired by HCA and knew Medical Directors at the HCA hospital in Gainesville were receiving $24,000.00 annually to discharge their additional Medical Director duties. He indicated he would be willing to serve as MDCPS at PCMC, but only if compensated at that same rate.

45.     After returning to PCMC, Relator briefed Moore that Dr. Ahmad was unwilling to serve as MDCPS unless paid $24,000.00 per year to take on the additional responsibilities that role entailed.

---

[19] Moore had shown Relator a copy of the contract that Dr. Ahmad apparently had signed with PCMC in 2012 providing for his appointment as MDCPS.  That contract also provided Dr. Ahmad was to be paid $120.00 per hour for shouldering the MDCPS responsibilities. One of the principal reasons Relator sought the meeting with Dr. Ahmad was to ensure that the PCMC Sleep Lab had the required physician supervision in place to satisfy 42 CFR §410.32's dictates.

[20] Relator also had brought to the meeting a document for Dr. Ahmad to sign that would enable him to receive compensation for the time spent in meeting with Relator that day.

46.     Thereafter, Moore approached Dr. Singh to determine whether he would be willing to serve as MDCPS at the $120.00 per hour rate reflected in the 2012 "contract" between PCMC and Dr. Ahmad.  Dr. Singh agreed to do so. Moore then sought a meeting with PCMC's then-newly appointed CEO, Chris Mosley, to brief him on the matter. At a meeting held in Mosley's office on July 30, 2015, Moore informed him that she believed that PCMC might be exposed to federal liability by not having a physician who supervised the Diagnostic Tests done at the hospital.  She also shared that, throughout the time she had been serving as DCPS, Dr. Ahmad – although signatory to a 2012 contract to serve as MDCPS – had never actually performed any of the duties of a MDCPS and had claimed he had never been paid for any such duties.  Moore gave Mosley a copy of Dr. Ahmad's 2012 "contract" as well as a copy of §410.32 for his review. To Moore's surprise, Mosley pushed both documents back across his desk towards her without reviewing them and curtly observed: "I don't see any problem with the situation."[21]

47.     Given's Mosley's response, Moore determined that she needed to escalate the matter to PCMC's Compliance Officer ("CO"). That next day, Moore emailed Stewart Whitmore, PCMC's CO,[22] to brief him on the matter.  Moore's July 31, 2015 email to Whitmore is reproduced below, in pertinent part:

> Stewart,
>
>     With the recent acquisition of PCMC by HCA, and our upcoming QRS survey, there is a matter I believe requires clarification by you in your capacity as our Compliance Officer. It regards the status of our "Medical Director" ("Supervising

[21] Despite all that Moore had shared with him, Mosley never followed up with either Dr. Ahmad or Dr. Singh to determine for himself whether PCMC was performing the Diagnostic Tests in compliance with §410.32 requirements.  And contrary to PCMC policy, Mosley never presented the noncompliance issue that Moore had shared with him to PCMC's Ethics and Compliance Committee for further evaluation.

[22] Whitmore also served as PCMC's Chief Financial Officer ("CFO").

Physician") for Cardiopulmonary Services here at PCMC. This is the issue I discussed with Chris Mosley July 30, 2015.

I am concerned that Dr. Iftikhar Ahmad may not be meeting the minimum standard of "physician supervision" as medical director for Cardiopulmonary Services, as set forth in Code of Federal Regulations 42 CFR 410.32:

"Levels of Supervision… diagnostic tests… must be furnished under at least a general level of physician supervision…."; "Under general supervision, the training of the non-physician personnel who actually perform a diagnostic procedure and the maintenance of the necessary equipment and supplies are the continuing responsibility of the physician."

I am also concerned that Dr. Ahmad may not be meeting the minimum standard of "physician supervision" as set forth in Centers for Medicare & Medicaid Services LCD L29949:

"Pursuant to 42 CFR 410.32(b) diagnostic tests payable under the physician fee schedule that are furnished without the required level of supervision by a physician are not reasonable and necessary."

Moore concludes her email to Whitmore by asking whether PCMC is compliant with these "physician supervision" requirements.

48.    On August 3, 2015, Whitmore responded to Moore's email, copying CEO Mosley. In his response, Whitmore utterly ignores the §410.32 issue – a grievous breach of his duties as CO.[23] In fact, Whitmore failed to undertake even rudimentary due diligence into the compliance issue raised – notwithstanding his knowledge that Dr. Ahmad had not submitted a single request for payment as MDCPS over a 3+ year span – and (as Mosley had done) breached PCMC policy by failing to refer the matter to PCMC's Ethics and Compliance Committee for proper evaluation.

49.    In November 2015, Moore asked Relator to assist her in completing a report she was required to submit to PCMC's Executive Administration regarding the CMS Local

---

[23] A true and correct copy of the full email exchange between Moore and Whitmore is attached hereto and incorporated herein as **EXHIBIT "A"**.

Coverage Determination for Polysomnography and Sleep Testing (the "PSG LCD") issued by PCMC's Medicare Administrative Contractor ("MAC"), Wisconsin Physician Services ("WPS"). Upon information and belief, this report was required by, and was intended to be shared with, HCA's compliance personnel.

50.     Per the report template provided, PCMC was to note, *inter alia*, actions necessary to ensure that it was acting in compliance with the PSG LCD.  Relator completed that section of the report, writing that the hospital still needed to document its compliance with the "physician supervision requirements" of §410.32.

51.     Notwithstanding that PCMC's CEO and CO, and (upon information and belief) HCA's regulatory compliance department, were all notified of PCMC's failure to satisfy the "physician supervision requirements" of §410.32, no corrective action was taken.

### PCMC Conflicts of Interest / Moore Termination

52.     After PCMC's change of ownership in 2015, CFO/CO Whitmore began intruding upon the authority of Moore as DCPS and asserting control over respiratory therapist staffing levels. Whitmore propagated a "units of service" formula which, despite his lack of any medical licensure or education, he stated should be utilized by Moore in her respiratory therapist staffing decisions. Whitmore also sent nearly daily emails to Moore pressuring her to deploy his "units of service" formula in determining those staffing decisions.

53.     Moore repeatedly complained to Whitmore and CNO Kari Bolin that the staffing levels dictated by Whitmore's formula were inadequate and jeopardized patient wellbeing. Moore was passionate about patient care and would not abandon her professional conviction that it was being seriously compromised by Whitmore "units of service" formula.

54.     In July 2016, despite having had a long and successful career as a DCPS up to that point, Moore's employment was terminated abruptly.  Upon information and belief, the reason offered to justify that termination was a pretext; Moore's termination had been intended to not only silence her patient advocacy but to send a message to Relator and other PCMC employees that championing issues of patient welfare and regulatory compliance could have very deleterious career consequences.

**Further Evidence of PCMC's Knowing Failure
to Correct its 42 C.F.R. §410.32 Violations**

55.     In November 2016, the Director of Radiology Services ("DRS") at PCMC, Debra Casey, requested that Relator assist her in completing an updated report for PCMC's Executive Administration concerning the PSG LCD. Relator met with Casey, provided her with the updated report, and advised her that none of the PSG LCD requirements had changed in the 12 months since the prior year's report in November 2015. Relator also advised Casey that PCMC's Executive Administration had failed to correct the §410.32 noncompliance noted by him in the prior report. Relator emailed a copy of the updated November 2016 report to PCMC's CNO, Kari Bolin, as well.[24]

56.     In December 2016, Relator met with Moore's successor, the newly hired DCPS, David Hartzell, to brief him regarding the hospital's continuing breach of §410.32 requirements. Relator explained that PCMC's Executive Administration had failed to implement the required physician supervision of the Diagnostic Tests done at the hospital. Relator also informed Hartzell that although a "contract" had been signed by Dr. Ahmad in 2012 to serve as MDCPS, Ahmad had never performed any supervision of the nonphysician

---

[24] True and correct copies of the report and Relator's email to PCMC's CNO are attached hereto and incorporated herein as **COMPOSITE EXHIBIT "B"**.

18

personnel administering the Diagnostic Tests at the hospital. Relator noted that the information he was sharing could be verified by Hartzell directly were he to review the records of the sleep technicians and respiratory therapists to determine whether Dr. Ahmad had ever documented any supervisory acts vis-à-vis their testing activities.

57.     Hartzell did his due diligence and confirmed the accuracy of Relator's representations. Hartzell met with CEO Mosley to discuss the matter. Hartzell asked Mosley who the responsible supervising physician was for the Cardiopulmonary Services Department. Mosley presented Hartzell with a copy of the 2012 "contract" with Dr. Ahmad and laughingly boasted: "I haven't paid this guy [*i.e.*, Ahmad] a nickel!" The meeting concluded at that point.

58.     In January 2017, while reviewing the CMS website, Relator became aware of a new LCD – L36839 – published by WPS and scheduled for implementation in February 2017. LCD L36839 identified two new mandates applicable to PCMC's Sleep Lab operations: (1) hospital sleep labs would need to secure a separate sleep lab-specific accreditation if they did not already have one; and (2) physicians not board-certified in sleep medicine would be permitted to interpret PSG test results only if associated with a hospital with a board-certified sleep medicine physician on its staff.

59.     Since in January 2017 PCMC complied with neither of these two requirements, Relator immediately sought out DCPS Hartzell, showed him the new LCD, and explained these further regulatory requirements. Relator requested that Hartzell coordinate a meeting with PCMC's then-CO/CFO, Matthew Johnson, to discuss the new LCD requirements and devise a plan of action to bring PCMC into compliance.

60.     At that meeting, Relator explained to Johnson that PCMC needed to act quickly to comply or would be foreclosed from performing PSG and CPAP tests on patients with

Medicare, Medicaid, or other federally funded healthcare insurance coverage, and shared that neither Dr. Ahmad nor Dr. Singh would be eligible to interpret PSG and CPAP tests if PCMC did not bring a board-certified sleep medicine physician on staff. Johnson listened quietly, thanked Relator for bringing the matter to his attention, and then concluded the meeting without further comment.

61.     Relator received no further communication from Johnson, Hartzell or anyone else at PCMC regarding these compliance issues until Debra Casey emailed Relator on March 28, 2017. Casey's email to Relator had been prompted by an email she had received from HCA regarding L36839's requirements and requested that Relator research how PCMC might come into compliance with its terms.

62.     Over the following few weeks, Relator compiled detailed information on how PCMC could achieve sleep lab accreditation and also supplied Casey with a list of physicians in north and central Florida who were board-certified in sleep medicine. Relator heard nothing further from Casey on the subject.

63.     Over the next 13 months, Relator met with Hartzell periodically to ascertain the progress PCMC was making in becoming compliant with L36839.  Hartzell advised Relator that Johnson had assured him that: (a) an application had been submitted for proper accreditation of PCMC's Sleep Lab, and (b) Executive Administration was negotiating a contract with a colleague of Dr. Singh's, Dr. Mitra, a board-certified sleep medicine physician, to serve as Medical Director/Supervising Physician for all PSG, CPAP, EKG and PFT testing.

64.     In May 2018, however, Johnson advised Hartzell that PCMC's Executive Administration had not been able to conclude an agreement with Dr. Mitra, and that the hospital had withdrawn its pending application for accreditation of PCMC's Sleep Lab.

65.     Notwithstanding the fact that the hospital was operating in clear breach of at least three separate federal regulations at this time, PCMC continued to accept patients covered under Medicare, Medicaid, and other Federal Health Care Programs, continued to administer Diagnostic Tests to them, and continued to present or cause to be presented false or fraudulent claims for payment of some or all those testing services.

66.     Relator identified an additional board-certified sleep medicine physician in the greater Jacksonville area, Dennis Sorresso, M.D., and shared his contact information with Hartzell. Relator suggested Hartzell contact PCMC Executive Administration to request that they consider Dr. Sorresso for the role of Medical Director/Supervising Physician. Hartzell did so and a meeting with Dr. Sorresso was arranged during summer 2018.  Hartzell later reported to Relator that an agreement had been reached between PCMC and Dr. Sorresso for him to serve as Supervising Physician for all Diagnostic Tests. CNO Bolin also confirmed to Relator that such an agreement had been reached.[25]

67.     During late summer 2018, however, Hartzell informed Relator that Johnson had advised that an agreement with Dr. Sorresso had not been achieved, and that Sorresso had withdrawn his application for privileges at PCMC. Hartzell informed Relator that Johnson also had remarked: "I want to find a doctor who will do it for nothing."

68.     In September 2018, Hartzell arranged a meeting with PCMC's newly appointed CEO, Mark Dooley, and CFO/CO Johnson, to discuss a possible solution. In advance of the meeting, Relator shared information with Dooley and Johnson regarding the qualifications and

---

[25] Relator also mentioned to Bolin that should for any reason an agreement with Dr. Sorresso not be consummated, he believed that Dr. Bipin Bhatt would likely still be willing to sign a contract to serve as Medical Director/Supervising Physician.

willingness of Dr. Bipin Bhatt to serve as PCMC's Medical Director/Supervising Physician.[26] Relator witnessed Hartzell plead with Dooley and Johnson: "Help me get legit with this."

69.     In October 2018, Relator received a phone call from the manager of Flagler Hospital's sleep lab in St. Augustine, Florida. The manager shared that a Medicare patient (R.H.) had been scheduled for a CPAP titration study at Flagler Hospital, and that R.H.'s PSG had been performed at PCMC and interpreted by Dr. Richard Feibelman. She also mentioned that Dr. Feibelman was not a board-certified sleep medicine physician, and that unless he had been supervised by a physician at PCMC who *was* board-certified in sleep medicine, Flagler Hospital could not proceed with the CPAP study as PCMC's PSG "would be invalid."

70.     Relator immediately notified Hartzell of the call and requested that he apprise Johnson.  Hartzell did so, and later told Relator that Johnson had replied: "There was nothing to worry about," and that should any calls of a similar nature be received by Relator in the future they should be referred directly to him (Johnson).

71.     Relator then sought out and met with PCMC's Director of Risk Management, Carolyn Boyle, concerning the hospital's continued performance of Diagnostic Tests on patients covered by Federal Health Care Programs while in clear breach of §410.32 and LCD L36839 requirements.  Relator further noted that, as PCMC knew it was acting in violation of regulatory requirements in performing such testing, PCMC was causing its physicians interpreting those tests to be in breach of those federal regulatory requirements as well. When Boyle replied that PCMC was not responsible for the actions of the physicians, Relator pointed out that since PCMC had granted privileges to these physicians to interpret the test results, had

---

[26] Dr. Bhatt was a board-certified sleep medicine physician from Highlands Regional Medical Center, another HCA-owned hospital in central Florida (Sebring).

not withdrawn those privileges after it became aware of the compliance deficiencies, and that the hospital had granted privileges in "sleep medicine" to Dr. Feibelman during the second half of 2017 despite knowing he was not board-certified in sleep medicine, it appeared to him that PCMC could be exposing itself to potential liability.

72.    In the months following the events referred to in paragraphs 67-69, no corrective measures were implemented by PCMC Executive Administration. Yet PCMC continued to accept patients covered under Federal Health Care Programs, continued to perform Diagnostic Tests for them, and continued to present or cause to be presented false or fraudulent claims for payment of some or all those services.

73.    On December 22, 2018, during a Chamber of Commerce event held at PCMC, Johnson asked Relator whether "any patients [were] scheduled tonight for sleep testing?" Relator replied: "Yes, we have a full house." Johnson then asked whether any of those patients were covered by Medicare. Relator responded in the affirmative, and Johnson smirked.  As all the members of PCMC Executive Administration were seated together,[27] Relator perceived this as an opportunity to share what he believed to be a solution and said: "The way to fix this problem is for you to sign a contract with Dr. Bipin Bhatt in Sebring. He is board-certified in sleep medicine, and he is a staff physician at the HCA hospital in Sebring." CNO Moland then asked whether PCMC could "just meet the supervision requirement on paper." Relator replied that that was not a viable option and offered to forward her documentation supporting his assessment.[28]   Relator also mentioned that Dr. Bhatt had expressed a willingness to serve as

---

[27] PCMC Executive Administration consisted of the CEO, the CFO/CO and the CNO. As previously mentioned, the hospital's CEO was Mark Dooley, and the hospital's CFO/CO was Matthew Johnson. The hospital's  CNO, Denise Moland, had only recently come on board as of this December 22, 2018 conversation.

[28] Relator's follow up email to CNO Molland on December 28, 2018 is attached hereto and incorporated herein as **EXHIBIT "C"**.

PCMC's Medical Director/Supervising Physician and was only looking to be paid $100.00 per hour for his time, including travel time. Relator indicated that Dr. Bhatt had proposed visiting PCMC monthly to meet with the staff and review the Department's testing protocols and equipment, would prepare policies to guide the sleep technicians and respiratory therapists in the discharge of their testing functions, and be available to them each day by phone should they need him. CNO Moland asked Relator to contact Dr. Bhatt to confirm his continued interest in the Medical Director/Supervising Physician and then advise.

74.     Shortly thereafter, Relator spoke by phone with Dr. Bhatt and confirmed his willingness to act as PCMC's Cardiopulmonary Services Medical Director/Supervising Physician.  On December 28, 2018, Relator emailed CNO Moland to report this information. Over the next month, however, Relator neither saw nor heard any evidence that progress was being made, and when Relator contacted Dr. Bhatt directly, he learned that no one from PCMC had reached out to him.

75.     Relator then emailed CNO Moland on January 29, 2019 to encourage her to follow up with Dr. Bhatt.[29]  However, in a conversation Relator had with Dr. Bhatt several days later, the latter observed that he still had not been contacted by Moland or anyone else from PCMC. Relator then sought an office appointment with CNO Moland to follow up on the matter. A meeting for that purpose was scheduled for February 11, 2019 at 4:00 p.m.; however, at 3:30 p.m., Relator was advised by CNO Moland's secretary that Moland would not be able to make the meeting. Relator was able to reschedule the meeting for the following day at 1:00

---

[29] As alleged *supra*, Relator was far from alone in advocating that PCMC take the necessary steps to bring the hospital into compliance with governing federal regulatory requirements. Kimberly Moore, who served as Director of Cardiopulmonary Services until her employment was abruptly terminated in July 2016, had advocated to that end. Further, her replacement as Director of Cardiopulmonary Services, David Hartzell, even pleaded with CEO Dooley and CFO/CO Johnson to: "Help me get legit with this."

p.m., but at 12:00 noon on February 12, 2019, CNO Moland's secretary contacted Relator again to advise that the meeting had been canceled.   At 4:00 p.m. that day, Relator was informed by Hartzell that PCMC Executive Administration had decided to close the Sleep Lab and terminate the employment of all Sleep Lab employees.[30]

### Defendant's False or Fraudulent Representations

76.     Medicare reimbursement is subject to, *inter alia*, Parts A, B and C. The Diagnostic Tests at issue in this action are payable under Parts A, B and C only if compliant with applicable statutory and regulatory standards, including those established by §410.32.

77.     To participate in the Medicare program as a provider, Defendant was required to complete, execute, and submit an enrollment application to CMS.[31]   The application requires the provider to affirmatively certify that it will honor all applicable Medicare laws, regulations, and program instructions, and clearly discloses that payment by Medicare of any claim is *conditioned upon* its compliance with all such legal authorities.[32]

---

[30] Incongruously, the respiratory therapists who had been performing the EKG and PFT testing in violation of federal regulations were *not* terminated. Upon information and belief, PCMC continued to accept patients covered under Federal Health Care Programs, perform EKG and PFT testing services for them, and present or cause to be presented false or fraudulent claims for payment to the Government for those services.

[31] Pursuant to 42 C.F.R. §489.18, in the event of a provider change of ownership, "the existing provider agreement will automatically be assigned to the new owner." The new owner immediately becomes obligated under that assigned agreement to comply with all "applicable health and safety standards." Accordingly, irrespective of whether Defendant executed a new enrollment application or took assignment of the prior owner's agreement, Defendant was obligated to comply with the representations expressed in that agreement, together with all "applicable health and safety standards."

[32] The enrollment form to participate in the Medicare program(CMS-855A), at Section 15, incorporates the following disclosures and commitments:
"Additional Requirements for Medicare Enrollment. These are additional requirements that the provider must meet and maintain in order to bill the Medicare program. Read these requirements carefully. By signing, the provider is attesting to having read the requirements and understanding them. By his/her signature(s), the authorized official(s) named below and the delegated official(s) named in Section 16 agree to adhere to the following requirements stated in this Certification Statement:

***

78.     The Medicaid program, 42 U.S.C. §1396 *et seq.*, is a government health insurance program funded jointly by the federal and state governments. Each state administers its own Medicaid program, but remains subject to, and governed by, all applicable federal statutes, regulations, and guidelines. Medicaid also provides secondary insurance coverage for many recipients of Medicare, and often pays, in whole or in part, the premium for Medicare.

79.     To participate in the Medicaid program as a provider of medical or other health services, Defendant had to execute and submit an agreement (or take assignment of its predecessor's agreement) and affirmatively certify that it shall comply with all local, state, and federal laws, as well as rules, regulations and statements of policy issued relative to the Medicaid program.

80.     Throughout the Fraudulent Billing Period, Defendant presented or caused to be presented claims to Medicare, Medicaid and other Federal Health Care Programs utilizing the electronic 837-I format and/or CMS Form 1450 (UB-04). In addition to the required patient

---

2. I have read and understand the Penalties for Falsifying Information, as printed in this application. I understand that any deliberate omission, misrepresentation, or falsification of any information contained in this application or contained in any communication supplying information to Medicare, or any deliberate alteration of any text on this application form, may be punished by criminal, civil, or administrative penalties including, but not limited to, the denial or revocation of Medicare billing privileges, and/or the imposition of fines, civil damages, and/or imprisonment.

3. I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

***

5. I agree that any existing or future overpayment made to the provider by the Medicare program may be recouped by Medicare through the withholding of future payments.

6. I will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity."

https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/cms855a.pdf

identification data and other claim data, both formats required Defendant to note the correct code for each diagnostic testing service provided, the dates and locations of the tests, the specific charges claimed for each test service, and Defendant's NPI number. Throughout the Fraudulent Billing Period, Defendant compiled and presented this information, intending that it be paid the amounts identified in the claims submitted to WPS (Defendant's MAC) or to the MAO whose plan authorized and covered payment of the patient's test.

81.     Defendant presented or caused to be presented such claims to the Federal Health Care Programs through billing agents it had engaged for this purpose. Throughout the Fraudulent Billing Period, each electronic 837-I claim made or caused to be made, and each Form 1450/UB-04 claim submitted or caused to be submitted, by Defendant to WPS or an MAO affirmatively certified that the billing data supplied was true, accurate and complete, and did not knowingly or recklessly disregard, misrepresent or conceal material facts.

82.     Defendant's Medicare Provider Agreement ("MPA") reaffirmed its obligation to comply with all applicable federal laws, rules, and regulations, including all Medicare laws, regulations, reporting requirements, and CMS instructions. That MPA further made clear that:

    a.     services rendered by nonphysician providers were eligible for reimbursement only if those nonphysician providers were supervised by an appropriately credentialed physician; and

    b.     payments to Defendant for provider services were being made, in whole or in part, from federal funds, and subjected Defendant to all laws applicable to individuals or entities receiving federal funds, including the False Claims Act.[33]

---

[33] The MPA also required Defendant to maintain a compliance plan that included (1) measures to detect, correct and prevent fraud; (2) written policies, procedures and standards of conduct detailing its commitment to comply with all applicable federal standards; (3) the designation of a compliance officer and compliance committee responsible for high level oversight of its compliance plan; (4) effective training and education for its compliance officer and employees, governing body members, and agents; (5) enforcement of standards through well-publicized disciplinary action; (6) procedures for effective, routine internal monitoring and auditing; and (7) procedures for ensuring prompt responses to detected offenses and development of corrective action initiatives related to any evidence of fraud and misconduct. Additionally, the MPA required that, within 5 business days of becoming aware of an actual, suspected, or potential compliance or fraud concern, Defendant report such

83.     Unless expressly noted otherwise herein, all factual allegations in this FAC are based upon information Relator personally knows to be true or learned as the consequence of:

a.     his pre-employment consultations with Kimberley Moore and Kari Bolin in May-June 2013;

b.     his subsequent employment at PCMC from December 2013 through March 1, 2019;

c.     his many conversations and email exchanges with his PCMC superiors from December 2013 through March 1, 2019;

d.     his daily conversations and/or email exchanges with PCMC patients (and prospective patients) from December 2013 through March 1, 2019;

e.     his daily conversations and/or email exchanges with PCMC's billing department staff members from December 2013 through March 1, 2019;

f.     his conversations and email exchanges with representatives of CMS, WPS, the MAOs, and sleep medicine authorities and accreditation entities; and

g.     his personal efforts, observations, research, and investigation.

From December 2013 through March 1, 2019, Relator was personally familiar with the false or fraudulent billing policies, practices and actions of Defendant as alleged herein. He would regularly interact with the PCMC billing department employees in explaining/clarifying the correct codes to be used in submitting claims for payment to the Federal Health Care Programs; he investigated patient concerns when the Federal Health Care Programs refused to pay for certain sleep lab services billed; and he communicated frequently with Utilization Review personnel from MAOs such as Blue Cross, United Healthcare, Humana, Aetna (and many others) to secure authorization approvals for PCMC patients with Medicare Advantage plans administered by those MAOs. These interactions occurred on almost a daily basis and often

---

compliance or fraud concern to WPS. The executed MPA is in the possession, custody and/or control of Defendant, and Relator will seek its production during discovery.

were prompted by inquiries Relator received from PCMC billing department agents whose primary job function was to complete and present claims for payment to the Federal Health Care Programs.

84.     Relator also personally became aware of Defendant's submissions of false or fraudulent billings to the Federal Health Care Programs because he periodically was informed by his superiors of the sums paid to PCMC for the PSG and CPAP testing services the Sleep Lab had rendered.[34]

85.     Furthermore, Relator regularly was directed by his superiors at PCMC to increase the number of patients tested – and Federal Health Care Program billings generated – by the Sleep Lab facilities he managed. Admonitions to increase the number of patients served, and revenues generated, by the Sleep Lab would have been utterly nonsensical had Defendant *not* been causing the presentation of PSG and CPAP testing claims to the Federal Health Care Program for payment.

86.     From December 2013 through March 1, 2019, *virtually all* the patients Relator and PCMC sleep technicians and respiratory therapists administered PSG, CPAP, EKG and PST tests to – over 90% – were insured under one or more of the Federal Health Care Programs.[35] Indeed, an important part of the Sleep Lab's responsibilities was confirming each patient's insurance coverage in advance of testing. When a patient was referred to PCMC for

---

[34] Additionally, PCMC was required by HCA to compile annual reports documenting the financial performance of each department and sub-department within the hospital, and DCPS Hartzell shared with Relator a portion of one such report showing that the Sleep Lab had increased year-over-year profits by 25% in 2016 vs. 2015 and had increased year-over-year revenues by 40% during the same timeframe. As over 90% of the patients served by Relator and other staff members of the Sleep Lab were beneficiaries of Federal Health Care Programs, the dominant share of PCMC revenues derived from the PSGs and CPAPs administered was paid by those Federal Health Care Programs.

[35] And given the demographics of the greater Palatka, Florida area during July 2009-December 2013, it is reasonable to presume that this 90%+ figure holds for that timeframe as well.

PSG and CPAP tests, one of the threshold responsibilities Relator (and his staff) had was to contact the patient to confirm his or her specific insurance coverage and co-pay obligation in advance of performing any testing.[36]

87.    Throughout the Fraudulent Billing Period, the Federal Healthcare Programs only paid for medically "reasonable and necessary" Diagnostic Tests.[37] As alleged *supra*, Diagnostic Tests are only deemed "reasonable and necessary" services when performed under an appropriate level of physician supervision. §410.32(b)(1).[38]

88.    Throughout the Fraudulent Billing Period, §410.32's physician supervision standard was *never* met by Defendant.[39] Yet, despite the clarity and repeated reaffirmation of this regulatory standard by CMS time and time again, never during the Fraudulent Billing Period did any PCMC physician provide the required ongoing training of the nonphysician personnel administering the Diagnostic Tests; ever observe, monitor, or provide any direction to the those performing those Diagnostic Tests; author or approve policies and procedures to govern the conduct of the nonphysician personnel administering the Diagnostic Tests; or even make a contact phone number available should the need for physician consultation arise.

---

[36] Occasionally, patients for whom PSG testing had been scheduled contacted Relator and his staff members to cancel their appointments because they had decided they simply couldn't afford to pay the copayments required of them per their Federal Health Care Programs.

[37] See, e.g., 42 U.S.C. §1395y(a)(1)(A); Fla. Stat. §409.905; TRICARE Policy Manual, 6010.54-M Ch. 11, s.12.1 (II)(C)(7).

[38] See also Fla. Stat. §409.905 ("Any service under this section shall be provided only when medically necessary and in accordance with state and federal law."); Fla. Stat. §409.905(4), (6); Fla. Stat. §409.907.

[39] Notably, not all diagnostic tests performed by nonphysician personnel are subject to a physician supervision requirement in the federal regulations, and several exceptions have been recognized. See 42 C.F.R. §410.32(b)(2). Absent a specific exclusion granted by CMS, however, it has long been CMS' considered medical judgment that "appropriate supervision is a key aspect of the delivery of safe and high-quality hospital outpatient services to Medicare beneficiaries." 73 Fed. Reg. 223, p. 68703 (Nov. 18, 2008). It should further be noted that CMS relies upon a broad and extensive set of experts in arriving at its regulatory judgments. See https://www.cms.gov/Regulations-and-Guidance/Guidance/FACA/MEDCAC

89.     Moreover, critically significant EKG tests physicians had ordered for their PCMC patients were not done.  After Whitmore became the hospital CFO  – and continuing under CFO Johnson – PCMC respiratory therapists frequently were unable to administer the serial EKGs ordered by PCMC physicians – especially between the hours of midnight and 6:00 a.m. – because Whitmore and Johnson inadequately staffed the night shift to save money, in contravention DCPS Moore's clinical judgment.

90.     By imposing a system of "units of service" upon all respiratory therapist staffing decisions, PCMC's CFOs substituted an arcane financial calculus for clinical judgments regarding patient wellbeing. And Whitmore and Johnson were able to get away with these improper practices as the direct result of PCMC's noncompliance with §410.32; had a supervising physician exercised "overall direction and control" of the Cardiopulmonary Services Department, that physician would have had the authority and the medical incentive to ensure staffing decisions were driven by patient care concerns, and not the pecuniary interests of the hospital and its CEOs, CFOs and CNOs – all of whom were eligible to receive substantial bonuses if PCMC met or exceeded financial targets.

91.     Upon information and belief, Relator alleges that incident to an onsite investigation at PCMC that occurred in late 2015/early 2016 and was triggered by the tragic death of a child patient, the Florida Agency for Healthcare Administration concluded that PCMC's staffing levels were inadequate.[40]

92.     However, neither the repeated failures to perform serial EKGs ordered by physicians – which are relied upon to aid in the diagnosis of heart attacks and other potentially

---

[40] It is unknown to Relator whether this finding of inadequate PCMC staffing levels involved the Cardiopulmonary Services Department, but the fact that physician orders for serial EKGs are regularly not being performed on cardiac patients at PCMC created, and upon information and belief continues to create, serious and unconscionable risks to those patients.

fatal heart conditions, repeated prior warnings from PCMC's DCPS Moore, nor even the death

of a child traceable to inadequate staffing levels, served to awaken PCMC to the reality that its

CFOs lacked the qualifications necessary to exercise "overall direction and control" of staffing

decisions for the Cardiopulmonary Services Department.

### Defendant's Failure to Comply with Regulatory Requirements Directly "Caused" Physician Claims for Interpretation of those PSG, CPAP, EKG and PFT Tests, and the DME Ordered Based on Those Tests, Ineligible for Payment

93.     The Federal Health Care Programs for physician interpretation of diagnostic

test results and, if appropriate, the rental or purchase of DME prescribed by that patient's

treating physician – provided that the physicians' interpretation services and DME orders are

deemed "necessary and reasonable for treatment of an illness …."

94.     Since none of the Diagnostic Tests performed at PCMC during the Fraudulent

Billing Period ever complied with the physician supervision requirements of § 410.32, none of

them were eligible for payment under any of the Federal Health Care Programs.

95.     And since the services of the physicians in interpreting those Diagnostic Tests

– and in prescribing CPAP devices (and other related DME) based on those interpretations –

were based entirely upon Diagnostic Tests that failed to meet the "reasonable and necessary"

standard, the physician and DME claims generated by those providers likewise failed to qualify

as "reasonable and necessary" and thus represented false claims submitted for payment under

the Federal Health Care Programs.[41]

---

[41] CMS' National Coverage Determination for CPAP therapy for OSA required that provision of CPAP devices be justified by a Medicare-sanctioned PSG test. See Publication Number 100-3; Manual Section Number 240.4.

**Defendants' Failure to Comply with Regulatory Requirements also "Caused"
Multiple MAOs to Present Billings to the United States of America
and the State of Florida That Were Ineligible for Payment**

96.     Throughout the Fraudulent Billing Period, Defendants' knowing compliance failures, misrepresentations, and material omissions also "caused" Blue Cross, United Healthcare, Humana, Aetna, and other MAOs to present false or fraudulent billings to the Federal Health Care Programs.

97.     Throughout the Fraudulent Billing Period, the MAOs collected payments from the Federal Health Care Programs that were then remitted to PCMC, treating physicians and DME companies for, or predicated upon, Diagnostic Tests performed in violation of §410.32.

## V.     FALSE CLAIMS ACT LEGAL STANDARDS

98.     The False Claims Act provides for the award of civil penalties and treble damages against those who: (1) knowingly cause the submission of false or fraudulent claims for payment to the United States Government, 31 U.S.C. §3729(a)(1); (2) knowingly make, use, or cause to be made or used, false records or statements material to false or fraudulent claims for payment to the United States Government, 31 U.S.C. §3729(a)(1)(B); and/or (3) knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money to the United States of America, 31 U.S.C. §3729(a)(1)(G). As of the date of this FAC, civil penalties of not less than $11,665.00 and not more than $23,331.00[42] for each false or fraudulent prohibited act, plus 3 times the actual damages which the Government sustains as the result of such prohibited acts, are recoverable from Defendant.

---

[42] These individual civil penalty ranges are to be adjusted for inflation per the Federal Civil Penalties Inflation Adjustment Act of 1990, 31 U.S.C. §3729(a)(1)(G), and the adjusted levels of those civil penalties are published at 28 C.F.R. 85.5.

99.     In illuminating the broad reach of the False Claims Act, Congress established the following definitions in 31 U.S.C. §3729(b) that are germane to this action:

(1)     the terms "knowing" and "knowingly"-

    (A)     mean that a person, with respect to information-

        (i)     has actual knowledge of the information;

        (ii)     acts in deliberate ignorance of the truth or falsity of the information; or

        (iii)     acts in reckless disregard of the truth or falsity of the information; and

    (B)     require no proof of specific intent to defraud;

(2)     the term "claim"-

    (A)     means any request or demand, whether under a contract or otherwise, for money or property, and whether or not the United States has title to the money or property, that-

        (i)     is presented to an officer, employee or agent of the United States; or

        (ii)     is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government-

            (I)     provides or has provided any portion of the money or property requested or demanded; or

            (II)     will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded….

(3)     the term "obligation" means an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment; and

(4)    the term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

## VI.    THE CAUSES OF ACTION

### Count I - Violation of the Federal False Claim Act
### 31 U.S.C §3729(a)(1)(A)

100.    Relator realleges and incorporates by reference paragraphs 1-4, 6-9, and 11-99 of the FAC as though fully set forth herein.

101.    Defendant, and its agents and employees, in reckless disregard for or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and upon information and belief are still presenting or causing to be presented, to the United States of America and its agents, false and fraudulent claims, records and statements in order to obtain payment or approval of payment for healthcare services and DME that were and are plainly ineligible for payment, in violation of 31 U.S.C. §3729(a)(1)(A).

102.    The United States of America and its agents, unaware of the falsity of the claims, records and statements made by Defendant and its agents and employees, and in reliance on the accuracy, integrity and completeness of such claims, records, and statements, paid, and upon information and belief continue to pay, for healthcare services and DME that were and are plainly ineligible for payment.

103.    As a result of Defendant's unlawful conduct, the United States of America has been, and may continue to be, severely damaged.

## Count II - Violation of the Federal False Claim Act
### 31 U.S.C §3729(a)(1)(B)

104.    Relator realleges and incorporates by reference paragraphs 1-4, 6-9, and 11-99 of the FAC as though fully set forth herein.

105.    Defendant, and its agents and employees, in reckless disregard for or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and upon information and belief are still making, using, or causing to be made or used, to the United States of America and its agents, false records or statements material to false or fraudulent claims for payment or approval of payment for healthcare services and DME that were and are plainly ineligible for payment, in violation of 31 U.S.C. §3729(a)(1)(B).

106.    The United States of America and its agents, unaware of the falsity of the claims, records and statements made by Defendants and its agents and employees, and in reliance on the accuracy, integrity and completeness of such claims, records, and statements, paid, and upon information and belief continues to pay, for healthcare services and DME that were and are plainly ineligible for payment.

107.    As a result of Defendant's unlawful conduct, the United States of America has been, and may continue to be, severely damaged.

## Count III - Violation of the Federal False Claim Act
### 31 U.S.C §3729(a)(1)(G)

108.    Relator realleges and incorporates by reference 1-4, 6-9, and 11-99 of the FAC as though fully set forth herein.

109.    Defendant, and its agents and employees, had and continues to have an ongoing legal obligation to report and disclose overpayments to the United States of America pursuant

to, *inter alia*, 42 U.S.C. §§1320a-7a and 1320a-7b; 42 U.S.C. §1395u; 42 C.F.R. §§405.301-379; 42 C.F.R. §§405.377-78; 42 C.F.R. §489.20; 42 C.F.R. §489.40-41; but has failed, and continues to fail, to do so.

110.    Defendant, and its agents and employees, in reckless disregard for or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased an obligation to pay or transmit money or property to the United States of America relating to payments had and received for healthcare services and DME that were and are plainly ineligible for payment, in violation of 31 U.S.C. §3729(a)(1)(G).

111.    As a result of Defendant's unlawful conduct, the United States of America has been, and may continue to be, severely damaged.

<u>**Count IV - Violation of the Florida False Claim Act**</u>
<u>**Fla. Sta. §68.083(2)(a)**</u>

112.    Relator realleges and incorporates by reference paragraphs 1-3, 5-75, 78-81, and 83-99 of the FAC as though fully set forth herein.

116.    This is a civil action brought by Relator, on behalf of the State of Florida, against Defendant under the Florida False Claims Act, Fla. Stat. §68.083(2).

117.    Through the various acts and omissions described above, Defendant, and its agents and employees, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or cause to be presented, and upon information and belief, continue to knowingly present or cause to be presented, to an officer or employee of the State of Florida, or its agencies, false or fraudulent claims for payment or approval, in violation of Fla. Stat. §68.082(2)(a).

118.    The State of Florida, or its agencies, unaware of the falsity of the claims, records and statements made by Defendant, and its agents and employees, and in reliance on the accuracy, integrity and completeness of such claims, records, and statements, paid, and upon information and belief continues to pay, for healthcare services and DME that were and are ineligible for payment.

119.    As a result of the various acts and omissions described above, the State of Florida, or its agencies, have been, and may continue to be, severely damaged.

## Count V - Violation of the Florida False Claim Act
## Fla. Sta. §68.083(2)(b)

120.    Relator realleges and incorporates by reference paragraphs 1-3, 5-75, 78-81, and 83-99 of the FAC as though fully set forth herein.

121.    This is a civil action brought by Relator, on behalf of the State of Florida, against Defendant under the Florida False Claims Act, Fla. Stat. §68.083(2).

122.    Through the various acts and omissions described above, Defendant, and its agents and employees, in reckless disregard for or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and upon information and belief are still making, using, or causing to be made or used, to an officer or employee of the State of Florida, or its agencies, false records or statements material to false or fraudulent claims for payment or approval of payment for healthcare services that were ineligible for payment, in violation of Fla. Stat. §68.082(2)(b).

123.    The State of Florida, or its agencies, unaware of the falsity of the claims, records and statements made by Defendant, and its agents and employees, and in reliance on the accuracy, integrity and completeness of such claims, records, and statements, paid, and upon

information and belief continues to pay, for healthcare services and DME that were and are ineligible for payment.

124.    As a result of the various acts and omissions described above, the State of Florida, or its agencies, have been, and may continue to be, severely damaged.

**Count VI - Violation of the Florida False Claim Act – Fla. Sta. 68.083(2)(g)**

125.    Relator realleges and incorporates by reference paragraphs 1-3, 5-75, 78-81, and 83-99 of the FAC as though fully set forth herein.

126.    This is a civil action brought by Relator, on behalf of the State of Florida, against Defendant under the Florida False Claims Act, Fla. Stat. §68.083(2).

127.    The State of Florida, or its agencies, unaware of the falsity of the claims, records and statements made by Defendant, and its agents and employees, and in reliance on the accuracy, integrity and completeness of such claims, records, and statements, paid, and upon information and belief continues to pay, for healthcare services that were and are ineligible for payment.

128.    Defendant, and its agents and employees, in reckless disregard for or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased an obligation to pay or transmit money or property to an officer or employee of the State of Florida, or its agencies, relating to those payments had and received for healthcare services and DME that were and are ineligible for payment, in violation of Fla. Stat. §68.082(2)(g).

129.    As a result of the various acts and omissions described above, the State of Florida, or its agencies, have been, and continues to be, severely damaged.

## VII.   **PRAYER FOR RELIEF**

WHEREFORE, Willard Revels, as Relator, prays for judgment to be entered against Defendant as follows:

1.     that Defendant be ordered to cease and desist from presenting, or causing to be presented, any further false claims, or further violating 31 U.S.C. §3729 *et seq*., and Fla. Stat. §68.081 *et seq*.;

2.     that judgment be entered in favor of the United States of America and Relator against the Defendant for civil penalties and treble damages in an amount to be determined in accordance with 31 U.S.C. §3729(a);

3.     that judgment be entered in favor of the State of Florida and Relator against the Defendant for civil penalties and treble damages in an amount to be determined in accordance with Fla. Stat. §68.082(2);

4.     that Relator be awarded the maximum amount permissible according to 31 U.S.C. §3730(d) and Fla. Stat. §68.085;

5.     that judgment be entered in favor of the United States of America, the State of Florida and Relator against the Defendant in an amount representing the sum of all recoverable costs incurred in this action, including, but not limited to, filing fees, expert witness fees, and all reasonable attorneys' fees incurred in the prosecution of this action; and

6.     that the United States of America, the State of Florida and Relator be granted such other and further relief as this Court finds just and proper.

## VIII.   <u>**DEMAND FOR JURY TRIAL**</u>

In accordance with Fed. R. Civ. P. 38, Relator hereby demands a trial by jury of all

issues so triable in this action.

Respectfully submitted,

*<u>/s/ James A. Gustino</u>*
James A. Gustino
Florida Bar No. 612499
JAMES A. GUSTINO, P.A.
P.O. Box 784959
Winter Garden, Florida 34778-4959
(407) 625-6700 */ telephone*
jgustino@gustinolaw.com */ svc email 1*
gustinolaw@protonmail.com */ svc email 2*

Trial Counsel for Relator, Willard Revels