**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA,
ex rel. Willard Revels, THE STATE
OF FLORIDA, ex rel. Willard
Revels, and WILLARD REVELS,
Relator,

      Plaintiffs,

v.                                                                      Case No. 3:19-cv-834-TJC-LLL

PUTNAM COMMUNITY MEDICAL
CENTER OF NORTH FLORIDA,
LLC,

      Defendant.

_____

## O R D E R

      This is a <u>qui</u> <u>tam</u> case under the Federal ("FCA") and Florida False Claims

Acts ("FFCA"). Relator Willard Revels' Corrective Second Amended Complaint

alleges that from 2009 through 2019, Defendant Putnam Community Medical

Center ("PCMC"), its current owner HCA Healthcare ("HCA"), and its

predecessor owner filed fraudulent claims to federal health insurers. (Doc. 70).

PCMC filed a Motion to Dismiss. (Doc. 74). Relator filed a Memorandum in

Opposition ("Response"). (Doc. 79). The United States and the State of Florida

both declined to intervene, but the United States has filed a Statement of

Interest. (Docs. 11, 12, 80).

The Court dismissed Revels' First Amended Complaint but granted Revels leave to depose three individuals before filing a Second Amended Complaint ("SAC"). (Doc. 57). PCMC filed a Motion to Strike Allegations in Relator's SAC, (Doc. 75), and Revels filed a Response, (Doc. 77).

## I.     BACKGROUND

### A.     Alleged Facts

PCMC, located in Palatka, Florida, is an acute care facility (a hospital) previously owned by LifePoint Hospitals and now owned by HCA. (Doc. 70 ¶¶ 9, n.8, 13). Relator alleges that PCMC provided a variety of sleep and cardiopulmonary tests ("diagnostic tests") for patients, most of whom were covered by some form of government-provided healthcare insurance. Id. ¶¶ 2, 17. Relator worked at PCMC as a polysomnography technologist from December 2013–May 2015 and then as the Manager of PCMC's Sleep Lab from May 2015– March 2019. Id. ¶ 8. His position was terminated in 2019 when PCMC closed the Sleep Lab as part of an "alleged reshuffling of 'business priorities' that abruptly ended all Sleep Lab services performed at PCMC," following several years of his approaching PCMC's leadership to report its non-compliance with federal regulations. Id. ¶ 8; see, e.g., id. ¶¶ 58, 66, 75, 83, 87.

Medicare regulations, specifically 42 C.F.R. § 410.32(b)(1), stipulate that all diagnostic tests "must be furnished under the appropriate level of supervision by a physician as defined in section 1861(r) of the Act," otherwise,

the tests "are not reasonable and necessary." 42 C.F.R. § 410.32(b)(1). The appropriate level of supervision requires a

> physician's overall direction and control, but the physician's presence is not required during the performance of the procedure. Under general supervision, the training of the nonphysician personnel who actually perform the diagnostic procedure and the maintenance of the necessary equipment and supplies are the continuing responsibility of the physician.

Id. § 410.32(b)(3)(i). Without a supervising physician, the SAC alleges, tests could not have been "reasonable and necessary" under § 410.32 because they did not meet the legal requirements. (Doc. 70 ¶ 30).

Relator alleges that from 2009 until at least 2019 ("fraudulent billing period"), PCMC "falsely depicted" that the diagnostic tests were supervised by a physician. Id. ¶¶ 2, 29. Relator alleges that no supervising physician trained the technicians performing the diagnostic tests during the fraudulent billing period. Id. ¶ 32. He thus alleges that all diagnostic tests, follow-up tests, and medical equipment, such as CPAP machines, that were prescribed based on the diagnostic test results ("downstream claims") were fraudulently procured. Id. ¶ 109. Relator alleges that "virtually all" patients (over 90%) receiving health care services at PCMC were insured under federal health care programs. Id. ¶ 103 (emphasis removed). Relator alleges PCMC therefore knowingly submitted ineligible claims amounting to millions of dollars to Medicare, Medicaid, Champ VA, Veteran's Choice, Tricare, and the Federal Railroad

Retirement Program, and caused providers to make fraudulent downstream claims. Id. ¶¶ 3, 109. Relator alleges that "tens of thousands" of these false claims for diagnostic tests were made from 2009–2019. Id. ¶¶ 2, 29. He alleges that he was personally aware of these claims being submitted because he "regularly interacted with the PCMC billing department," "personally confirmed" patients' insurance, "investigated" when federal providers declined payments, "communicated frequently" with health care companies providing Medicare Advantage plans, and "was informed by his supervisors" about the Sleep Lab's billing. Id. ¶ 101. He provides records of several claims billed to Medicaid for "sleep medicine diagnostic tests" between 2015 and 2018. (Doc. 70-5). He also provides a record of a downstream claim that was paid for by insurance. (Doc. 70-6).

Relator extensively alleges that PCMC's CEOs, Compliance Officers, and Directors of Cardiopulmonary Services knew that PCMC was not compliant throughout the relevant term. (Doc. 70 ¶¶ 2, 32, 39, 55–56). Relator alleges that he learned there was a doctor with the title Medical Director of Cardiopulmonary Services who, on paper, was to perform the required medical supervision and training duties, but that he did not perform training nor supervised the lab as required by federal regulations. Id. ¶¶ 46, 51–52. The doctor "had never performed any duties as [Medical Director] . . . and had never requested or received any compensation for doing so." Id. ¶ 52 (emphasis

4

omitted). Relator and his supervisors approached PCMC's leadership about the lack of a supervising physician several times. E.g., id. ¶¶ 47, 54–56, 67–73. He alleges that PCMC's leadership rebuffed them at every turn. Id. ¶¶ 47, 54, 56.

Relator alleges that by failing to have a supervising physician for the labs performing diagnostic tests, PCMC violated the FCA, 31 U.S.C. § 3729(a)(1)(A), and the FFCA, FLA. STAT. § 68.083(2)(a) for "presenting . . . false or fraudulent claims to the United States of America and the State of Florida" ("Presentment Claims"); § 3729(a)(1)(B) and FLA. STAT. § 68.083(2)(b) for "making . . . false records or statements material to" those claims ("False Records Claims"); and § 3729(a)(1)(G) and FLA. STAT. § 68.083(2)(g) for "concealing, or knowingly and improperly avoiding or decreasing, obligations to pay or transmit money to the United States . . . and Florida" ("Reverse False Claims").[1] (Doc. 70 ¶ 1). He alleges that HCA made express false representations because it confirmed that it would abide by all applicable regulations. Id. ¶¶ 94–98. He also alleges that PCMC's new owner, HCA, assumed the liabilities of PCMC's predecessor owner when it acquired the facility in 2015 because HCA took over and PCMC retained the previously existing license. Id. ¶ 9 n.8.

---

[1] "Because the Florida False Claims Act is modeled after the Federal False Claims Act, the claims [are] analyzed using the same general standards." United States v. Cypress Health Sys. Fla., Inc., No. 1:09cv137-SPM-GRJ, 2012 WL 467894, at *1 (N.D. Fla. Feb. 14, 2012).

### B.    Procedural History

Relator first filed this qui tam action on July 16, 2019. (Doc. 1). The United States and the State of Florida both declined to intervene on October 10, 2020. (Docs. 11, 12). The Court ordered the complaint to be unsealed and served on November 3, 2020. (Docs. 13–15). The Court dismissed Relator's First Amended Complaint following a hearing on PCMC's motion to dismiss but permitted refiling. (Doc 57).

In dismissing the complaint, the Court instructed Relator to "properly state an FCA claim under Federal Rule of Evidence 9(b) and the Eleventh Circuit's precedent" and to "amplify his allegations that false claims were actually made to federal health care providers and the state of Florida." Id. at 2–3. It also told Relator to "be explicit as to materiality and causality, whether he is pleading an implied or explicit certification theory, and which claims relate to which counts," and to re-evaluate the sheer number and scope of his claims. Id. at 3. It permitted him to take three requested depositions without otherwise lifting the discovery stay. Id. at 3–4. Relator filed the SAC, and in response PCMC filed this Motion to Dismiss and Motion to Strike. (Docs. 70, 74, 75).

## II.    MOTION TO STRIKE

PCMC's Motion to Strike asks the Court to strike Paragraph 55 and Footnote 23 from the SAC. (Doc. 75). These paragraphs, PCMC argues, recount testimony from Kimberly Moore, former Director of Cardiopulmonary Services

at PCMC, the one individual Relator deposed. <u>Id.</u> at 6–9, nn.4–5. In Paragraph 55, the SAC alleges Moore had "personal knowledge that claims had been submitted by [PCMC] to Federal Health Care Programs," and recounts an email to PCMC's Chief Compliance Officer in which she expressed concern about PCMC not meeting the requirements for a physician supervisor. (Doc. 70 ¶ 55). Footnote 23 alleges that "Moore had direct access to the financial information associated with the [Cardiopulmonary Services Department] . . . ." <u>Id.</u> at n.23. PCMC argues in its Motion to Strike that Relator relies on information that he "alleges no basis for having personal knowledge" of, but obtained from Moore's deposition, to overcome the stringent requirements of Federal Rule of Procedure 9(b) for <u>qui</u> <u>tam</u> actions. (Doc. 75 at 4, 7). PCMC also points out that "Moore was not responsible for Medicare and Medicaid billing and her testimony on this topic was entirely vague and bereft of specifics." (Doc. 75 at 8) (citation omitted). Relator argues in response that PCMC fails to explain how the added information from Moore is the key piece upon which the SAC will succeed or fail. (Doc. 77 at 5–6). He argues more broadly that the SAC "amply met the concerns expressed by the Court" even without the challenged paragraph and footnote. <u>Id.</u> at 3.

The Eleventh Circuit has emphasized that courts cannot use "material obtained during discovery, prior to a final decision on a motion to dismiss . . . in cases to which the heightened pleading standard of Rule 9(b) applies if the

amendment would allow the plaintiff to circumvent the purpose of Rule 9(b)." Bingham v. HCA, Inc., 783 F. App'x 868, 876 (11th Cir. 2019).[2] In Bingham, the Eleventh Circuit considered a "[r]elator's complaint after excising the additional information obtained through discovery" and "agree[d] with the district court that the remaining allegations [did] not satisfy the pleading requirements of Rule 9(b)" because the complaint did not "state with any particularity" how the defendant violated the FCA. 783 F. App'x at 877. Here, however, as PCMC itself argues, even if additional information was obtained from Moore during discovery, it does not fill the required gap between Relator's prior allegations and what is required for an FCA claim. Relator needs to allege that claims were "actually made to federal health care providers and the state of Florida," as the Court clarified in its Order. (Doc. 57 at 3). The allegations in Paragraph 55 and Footnote 23 do not prove that claims were filed and therefore do not "circumvent the purpose of Rule 9(b)." Bingham, 783 F. App'x at 876. The paragraph and footnote need not be struck.[3]

_____

[2] The Court does not rely on unpublished opinions as binding precedent, however, they may be cited when the Court finds them persuasive on a particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060–61 (11th Cir. 2022).

[3] Alternatively, even if the Court were to strike the contested paragraph and footnote, its ruling on the Motion to Dismiss (Doc. 74) would remain the same for the reasons discussed below.

III.   **MOTION TO DISMISS**

A.   **The Parties' Arguments**

PCMC's Motion to Dismiss makes several arguments. (Doc. 74). The first group of these relate to regulatory standards: that Relator holds PCMC to an incorrect supervision standard because PCMC was not required to have a supervising physician as Relator alleges; id. at 17–19; that Relator does not allege that any claims were billed under the part of Medicare governed by 42 C.F.R. § 410.32; id. at 19–20; and that the regulatory instruction that requires a board-accredited physician to supervise the lab is a Local Coverage Determination and is thus not legally binding, id. at 20–21. PCMC then argues that the SAC does not sufficiently allege fraud under the Eleventh Circuit's and Rule 9(b)'s requirements. Id. at 22–29. PCMC argues that Relator has only alleged an implied certification, and that the SAC alleges no materially significant misrepresentations. Id. at 29–36. PCMC also argues that the legal requirements cannot extend to downstream claims that other doctors and facilities made relying on PCMC's certifications. Id. at 36–39. Finally, PCMC argues that Relator has not properly alleged any False Records Claims, and that because PCMC did not present false claims, it likewise made no Reverse False Claims in failing to report its prior claims to the government. Id. at 39–40.

Relator's Response argues that he has properly alleged FCA violations sufficient to withstand a motion to dismiss. (Doc. 79). His arguments include that the Court may properly rely on some inference to conclude that PCMC did submit claims to the government for payment. Id. at 9–10. He emphasizes that the core allegation of the SAC is that no one in PCMC's Sleep Lab ever received the training required by applicable regulations, and thus PCMC failed to comply with a material requirement. Id. at 18–19. He also argues the materiality of a violation is a holistic evaluation that may include whether Local Coverage Determinations were ignored. Id. at 20–22. Relator argues that his allegations form both an express and implied theory of certification.[4] Id. at 27–28, n.35.

## B.    Allegations of Actual Claims Submitted

Relator's six counts compose three categories of corresponding federal and Florida law violations. Before discussing each claim, the Court must consider whether Relator has sufficiently pled the submission of claims, because it specifically instructed Relator to ensure that he met the Rule 9(b) standard. (Doc. 57 at 2–3).

---

[4] The United States has also filed a Statement of Interest that provides the United States' view that Local Coverage Determinations may point to a material violation of the FCA, and emphasizes that its declination to intervene and its continued payment of claims even following Relator's qui tam action does not indicate whether Relator's allegations are sufficient. (Doc. 80).

"The Eleventh Circuit has often disfavored district courts inferring the submission of false claims." U.S. ex rel. & 84Partners, LLC, Relator, Plaintiffs, v. Huntington Ingalls Indust., No. 3:14-CV-1256-TJC-PDB, 2021 WL 4307510, at *4 (M.D. Fla. Sept. 22, 2021). Allegations of false or fraudulent claims are subject to the heightened pleading standard of Rule 9(b) and must "state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b).[5] "The mere disregard of federal regulations or improper internal practices does not create liability" unless "the relator [has] allege[d] the 'actual presentment of a claim . . . with particularity . . . .'" Urquilla-Diaz v. Kaplan Univ., 780 F.3d 1039, 1051–52 (11th Cir. 2015) (citations omitted). "The False Claims Act does not create liability merely for a health care provider's disregard

---

[5] Generally, federal civil complaints need only state "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a). And each averment should be "simple, concise, and direct," with no technical form of pleading required. FED. R. CIV. P. 8(d)(1). "However, '[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.'" U.S. ex rel. Clausen v. Lab'y Corp. of Am., 290 F.3d 1301, 1308 (11th Cir. 2002) (quoting FED. R. CIV. P. 9(b)).

Relator argues that Rule 11(b)(3), which permits "flexibility" based on "reasonably anticipated" evidence in pleading, should also permit a wider leniency on his claims. Rotella v. Wood, 528 U.S. 549, 560 (2000). The case he cites pre-dates both Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) and Ashcroft v. Iqbal, 556 U.S. 662 (2009), and as Relator points out, has not explicitly been cited as part of the Eleventh Circuit's rigorous fraud pleading standard. (Doc. 79 at 7 n.12).

of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe." U.S. ex rel. Clausen v. Lab'y Corp. of Am., 290 F.3d 1301, 1311 (11th Cir. 2002). A relator must "identify any specific claims that were submitted to the United States or identify the dates on which those claims were presented to the government." Id. at 1311 (citation and quotation marks omitted). Because the submission of the claim is the "sine qua non" of a FCA violation, it requires "some indicia of reliability . . . to support the allegation of an actual false claim for payment being made to the Government." Id. "At a minimum, a plaintiff-relator must explain the basis for her assertion that fraudulent claims were actually submitted." U.S. ex rel. Mastej v. Health Mgmt. Assocs., Inc., 591 F. App'x 693, 704 (11th Cir. 2014). How courts evaluate whether false claims were made depends on the type of false claim or statement alleged, the position of the relator, and whether the relator has "first-hand knowledge of the defendants' billing practices." United States v. Space Coast Med. Assocs., L.L.P., 94 F. Supp. 3d 1250, 1257–58 (M.D. Fla. 2015) (citations omitted). "[A] district court must analyze the totality of the circumstances . . . to determine whether the relators have met the requirement of providing sufficient indicia of reliability." Id.

Here, Relator alleges that he is certain that bills were submitted to the federal government based in part on his own interactions with patients and

12

insurers. (Doc. 70 ¶ 101). If Relator relied solely on general knowledge based on personal experience, his complaint would likely fall short, as did the complaint in U.S. ex rel. Sanchez v. Lymphatx, Inc., which relied on "general accusations of false billing" based on the relator's "personal knowledge" as an "office manager," without providing details on "dates," "frequency," "amounts," or "patients." 596 F.3d 1300, 1302 (11th Cir. 2010). Indeed, complaints lacking detail about any "amounts of charges," "actual dates," "policies about billing or even second-hand information about billing practices" or copies "of [any] bill[s] or payment[s]" do not meet the Rule 9(b) standard. Clausen, 290 F.3d at 1312.

But the SAC goes beyond Relator's own statements and experience: Relator provides copies of what he alleges are "[a]ctual representative claims submitted by [PCMC] and paid by the federal government . . . ." (Doc. 70 ¶ 106); (Doc. 70-5 at 3). This claims data shows "sleep medicine diagnostic tests rendered to Medicaid patients by PCMC" from 2015–2018 under CMT codes 95808, 95810, and 95811. (Doc. 70-5 at 3–4). PCMC argues this data does not help Relator because the data purportedly shows capitated, rather than fee-for-service claims. (Doc. 74 at 15 n.3, 25); see (Doc. 70-5 at 3). PCMC will have further opportunities to develop this argument, but for now the Court is satisfied that Relator has shown claims for diagnostic tests were presented to the government.

That said, not every alleged false claim in the SAC may move forward. Relator uses "diagnostic testing" to collectively describe polysomnographic studies ("PSG"), CPAP titration studies ("CPAP"), electrocardiogram tests ("EKG"), and pulmonary function tests ("PFT"). (Doc. 70 ¶ 2). Of these, Relator describes PSG and CPAP tests within the context of sleep disorder treatment, explaining that these tests were administered by sleep technicians in PCMC's Sleep Lab. Id. ¶¶ 19–24. In a separate section of the SAC, Relator discusses EKG and PFT tests, stating more broadly that they were administered to "patients suffering from or suspected of various cardiac conditions requiring clinical treatment" or "suffering from or suspected of various pulmonary conditions requiring clinical treatment." Id. ¶ 26. Relator does not allege that these tests were performed in the Sleep Lab or by sleep technicians, nor did he clarify this point when challenged by PCMC. See (Doc. 74 at 14–15 n.10). In fact, the SAC's later assertion that EKG and PFT testing continued even after the Sleep Lab was closed seemingly confirms that the EKG and PFT tests occurred in a separate department. (Doc. 70 ¶ 93 n.32). The problem is, Relator's relevant personal knowledge of diagnostic testing comes from his employment within the Sleep Lab, and his representative claims data—unaccompanied by any interpretative key—is specific to "sleep medicine." (Doc. 70-5 at 4). With no detailed personal knowledge or claims data to buttress his otherwise conclusory allegations for EKG and PFT diagnostic tests, only the "sleep medicine"

14

claims—premised on the PSG and CPAP tests from within the Sleep Lab—may move forward.

The downstream claims are similarly weak. Relator neither worked at the downstream providers, nor has he provided a claim demonstrably paid by the federal government to a downstream provider based on PCMC's certifications. He provides the medical records of John B. Revels (Relator's father), who apparently received a sleep diagnostic test at PCMC and a CPAP machine paid for by insurance, as an example of a downstream claim. (Doc. 70 ¶ 110); (Doc. 70-6); (Doc. 79 at 26). But the medical records do not specify the insurer who paid for the CPAP machine, undermining Relator's allegation that this billing record shows downstream claims were paid by the government. See (Doc. 70 ¶ 110); (Doc. 70-6). Because Relator has not adequately alleged that downstream claims were presented to and paid by the government, the downstream claims will be dismissed.

Finally, Relator's claims of violations before his employment began fall short. He alleges that PCMC submitted false claims "[s]ince at least 2009 and continuing through and until at least March 1, 2019 . . . ." (Doc. 70 ¶ 29). Relator does not allege personal involvement or knowledge across this entire span; indeed, he only joined the PCMC Sleep Lab in 2013. Id. ¶ 42. Because Relator's allegations and representative claims data provide no information on claims purportedly submitted before he joined PCMC in 2013 or after he left in

2019, only those claims made during his 2013-2019 employment survive.[6] See Mastej, 591 F. App'x at 709–10 (finding that the relator could reliably speak to conduct occurring while he was an employee, but when "[r]emoved from this vantage point" after his employment ended, the relator's allegations became overly speculative).

Therefore, while Relator has sufficiently alleged PCMC submitted actual claims for Sleep Lab PSG and CPAP diagnostic tests, he has not sufficiently alleged that claims from downstream providers, PCMC's non-Sleep Lab EKG and PFT diagnostic tests, or tests performed outside the period he was employed by PCMC were submitted to the government.

## C.   Illegality, Materiality, and Implied or Express Certification

Relator has specifically identified claims that PCMC made to the United States for diagnostic tests performed at its Sleep Lab, so the Court proceeds to consider PCMC's other legal arguments for why the SAC should be dismissed. PCMC argues first that Relator has failed to plead falsity in Count I because it had physicians present in the hospital, because Relator fails to allege any diagnostic tests billed under Medicare Part B, the section of Medicare that 42

---

[6] The SAC suggests that PCMC continued to submit false claims even after Relator's employment ended but provides no further details aside from a conclusory footnote. See (Doc. 70 at ¶¶ 93 n.32, 114, 118, 122, 127 132, 137). For the same reasons as the pre-employment claims, Relator has failed to show post-employment claims submission.

16

C.F.R. § 410.32 regulates, and finally because Local Coverage Determination L36839 alone cannot give rise to an enforcement action. (Doc. 74 at 17–21).

To allege an FCA claim under a theory of false certification, Relator must "allege facts that, if true, would show (1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." <u>Urquilla-Diaz</u>, 780 F.3d at 1052 (citations and quotation marks omitted). Similarly, for claims based on implied false certification, "liability can attach when the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement." <u>Universal Health Servs., Inc. v. U.S. ex rel. Escobar</u>, 579 U.S. 176, 181 (2016). Such nondisclosure is actionable if the "omission renders those representations misleading." <u>Id.</u>

Here, Relator has alleged that PCMC was required to have an active supervising physician in its Sleep Lab, that PCMC's directors were aware of and repeatedly ignored the requirement, that the requirement was material, and that the government did in fact pay claims based on PCMC's certification of its compliance. <u>See, e.g.</u>, (Doc. 70 ¶¶ 30–36, 57–60, 94, 100–01, 104–06) (Doc. 70-5). Relator has also alleged that the regulations, taken as a whole, required PCMC to have a supervising physician of its Sleep Lab, and that it failed to do so. (Doc. 70 ¶¶ 94, 104–05). Taking the allegations in the SAC in the light most

favorable to the non-movant and considering the United States' Statement of Interest arguing that violations of Local Coverage Determinations may support liability, Relator has sufficiently alleged in Count I that PCMC submitted claims that were potentially false. <u>See</u> (Doc. 80).[7]

### D.    False Records and Reverse False Claims

Besides alleging that PCMC submitted false or fraudulent claims in violation of 31 U.S.C. § 3792(a)(1)(A), in Count II Relator alleges that PCMC used false records or statements to have claims paid by the federal government, in violation of § 3792(a)(1)(B). (Doc. 70 ¶¶ 117–20). These claims likewise are subject to Rule 9(b)'s particularity pleading requirement and require a relator to show "'(1) the defendant made (or caused to be made) a false statement[;] (2) the defendant knew it to be false[;] and (3) the statement was material to a false claim.'" <u>United States v. Prometheus Lab'ys, Inc.</u>, No. 8:18-CV-2931-T-33AAS, 2020 WL 6203527, at *5 (M.D. Fla. Oct. 22, 2020) (quoting <u>U.S. ex rel. Phalp v. Lincare Holdings, Inc.</u>, 857 F.3d 1148, 1154 (11th Cir. 2017)). For the same reasons as above, Relator has sufficiently alleged that PCMC used false

---

[7] The Court instructed Relator to specify whether he alleges an implied or explicit theory of certification. (Doc. 57 at 3). The SAC calls the representations "[e]xpress," (Doc. 70 at 47), but as PCMC argues, the allegations appear to allege implied certification, (Doc. 74 at 30–32). Relator responds that he is making an express certification allegation but that his allegations satisfy both standards. (Doc. 79 at 27–29, n.35). The Court expects clarification as discovery proceeds.

statements in making claims for its Sleep Lab diagnostic tests. PCMC disputes the significance and falsity of statements made in its "enrollment application and provider agreements" and electronic 837-I claim forms. (Doc. 74 at 39). These arguments can be explored at later stages of the litigation—for now, Relator has sufficiently pleaded a false records claim.

Finally, looking at Count III, Reverse False Claims under § 3729(a)(1)(G), Relator has met his pleading burden. <u>See</u> (Doc. 70 ¶¶ 121–24). "Section 3729(a)(1)(G) creates liability for a person who 'knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government,' or who 'knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.'" <u>United States ex rel. Stepe v. RS Compounding LLC</u>, 304 F. Supp. 3d 1216, 1226 (M.D. Fla. 2018) (quoting § 3729(a)(1)(G)). PCMC's sole argument for dismissal is that the Reverse False Claims count "rests on defective allegations." (Doc. 74 at 40). For the reasons already stated, the Court disagrees.

### E.    Florida Claims

Finally, Relator has sufficiently alleged violations of the FFCA (Counts IV–VI). The FFCA is modeled on the FCA and is analyzed under the same standards. <u>Space Coast Med. Assocs., L.L.P.</u>, 94 F. Supp. 3d at 1252 n.4 (collecting cases). Still, even under the mirrored structure, a complaint must

allege facts implicating false claims submitted to the State of Florida, not just the United States. See United States v. Norman, No. 8:15-CV-1506-T-23AEP, 2018 WL 264253, at *3 (M.D. Fla. Jan. 2, 2018) (dismissing a complaint which "[said] nothing about a claim submitted to, or paid by, the State of Florida"). The representative claims Relator provides were paid by the federal government via Medicaid managed by the State of Florida, satisfying this requirement. See (Doc. 70-5 at 3). PCMC's only argument for dismissal is that the Florida claims "fall short for the same reasons as their federal counterparts." (Doc. 74 at 40). Because Relator has properly alleged violations of the parallel FCA and connected these allegations to the State of Florida, the FFCA counts may move forward as well.

Accordingly, it is hereby

**ORDERED:**

1.      Defendant Putnam Community Medical Center's Motion to Strike Allegations in Relator's Second Amended Complaint (Doc. 75) is **DENIED**.

2.      Defendant Putnam Community Medical Center's Motion to Dismiss (Doc. 74) is **GRANTED** to the extent that all claims before December 2013 or after February 2019, claims premised on EKG and PFT testing done in departments outside of the Sleep Lab, and all downstream claims are **DISMISSED with prejudice as specified herein**. The motion is **DENIED**

20

as to all federal and Florida state claims regarding PCMC's Sleep Lab diagnostic tests from December 2013 to February 2019.

       3.      Defendant Putnam Community Medical Center shall answer the Corrective Second Amended Complaint (Doc. 70) no later than **November 18, 2022**.

       4.      The Court-Imposed Stay on Discovery (Doc. 43) is **LIFTED**.

       5.      The parties shall jointly file a **CASE MANAGEMENT REPORT** no later than **November 18, 2022**.

       **DONE AND ORDERED** in Jacksonville, Florida the 26th day of October, 2022.



TIMOTHY J. CORRIGAN
United States District Judge

rmv/agb
Copies:

Counsel of record